# EXHIBIT 2

**LIPPSMITH LLP**
GRAHAM B. LIPPSMITH 9593, g@lippsmith.com
MARYBETH LIPPSMITH 11578, mb@lippsmith.com
JACLYN L. ANDERSON 11075, jla@lippsmith.com
CELENE CHAN ANDREWS 9902, cca@lippsmith.com
55 Merchant Street, Suite 1850
Honolulu, Hawai'i 96813
Tel: (213) 344-1820 / Fax: (213) 513-2495

Electronically Filed
FIRST CIRCUIT
1CCV-23-0001045
13-OCT-2023
01:57 PM
Dkt. 171 CAMD

**FOLEY BEZEK BEHLE & CURTIS LLP**
ROBERT A. CURTIS (California SBN 203870), rcurtis@foleybezek.com
Admitted *Pro Hac Vice*
KEVIN D. GAMARNIK (California SBN 273445), kgamarnik@foleybezek.com
Admitted *Pro Hac Vice*
LUIS A. SAENZ (California SBN 336311), lsaenz@foleybezek.com
Admitted *Pro Hac Vice*
15 West Carrillo Street
Santa Barbara, California 93101
Tel: (805) 962-9495 / Fax: (805) 962-0722

**ROBERTSON & ASSOCIATES, LLP**
ALEXANDER ROBERTSON, IV (California SBN 127042), arobertson@arobertsonlaw.com
Admitted *Pro Hac Vice*
32121 Lindero Canyon Road, Suite 200
Westlake Village, California 91361
Tel: (818) 851-3850 / Fax: (818) 851-3851

Attorneys for Plaintiffs and the Putative Class and Subclasses

## IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

### STATE OF HAWAI'I

| | |
|---|---|
| MONICA I. EDER; REDE S. EDER; BRUCE BAUM; SHERYL LYNN MARTIN; PATRICE CARLTON; MONA CHERRY; CLUB SPORTWEAR, INC. dba KAIALOHA SUPPLY; TERESA COLEMAN; LINDA BETHELL DONOVAN TRUST;  LINDA BETHELL DONOVAN; CANDICE FAUST; PETER FAUST; KAILI FAUST; DAVID HEYMES; TOMMY KNAPP; KRONSER TRUST; PAUL KRONSER; KRISTI LYNN KRONSER; JENNIFER LYNN MCNAMEE; RANDALL EUGENE MCNAMEE; CHARLENE MEDEIROS; CHARLOTTE MEDEIROS; ERIC MCCUMBER; JONATHAN MELIKIDSE; CHRISTY MELIKIDSE; ROSE O'LEARY; STEVEN DAVID POTTER; TIMOTHY PUTNAM; LORRI ROBUSTO; WILLIAM ROBUSTO; KATHRYN SAY; AYDIN SAY; | CIVIL NO. 1CCV-23-0001045 JPC (Property Damage/Personal Injury)<br><br>**SECOND AMENDED COMPLAINT; EXHIBIT "A"; DEMAND FOR JURY TRIAL; SUMMONS; CERTIFICATE OF SERVICE** |

STARDUST HAWAIʻI dba SEGWAY MAUI;
MARTY STEVENSON; CONSTANCE
STEVENSON; KAORU TANABE; ROLLAND
WILLIAMS, JR.; and JENNIFER WISEMAN,
Individually and in Their Representative Capacities
and on Behalf of a Class and Subclasses of All
Persons Similarly Situated,

                    Plaintiffs,

    vs.

MAUI ELECTRIC COMPANY, LIMITED;
HAWAIIAN ELECTRIC COMPANY, INC.;
HAWAII ELECTRIC LIGHT COMPANY, INC.;
HAWAIIAN ELECTRIC INDUSTRIES, INC.;
COUNTY OF MAUI; HAWAIIAN TELCOM;
HAWAIIAN TELECOMMUNICATIONS, INC.;
HAWAIIAN TELCOM, INC.; SPECTRUM
OCEANIC, LLC; CHARTER COMMUNICATIONS
HOLDING COMPANY, LLC; CHARTER
COMMUNICATIONS HOLDING, LLC; CHARTER
COMMUNICATIONS, LLC; CHARTER
COMMUNICATIONS OPERATING, LLC;
TRUSTEES OF THE ESTATE OF BERNICE
PAUAHI BISHOP; PETER KLINT MARTIN;
PETER KLINT MARTIN REVOCABLE TRUST;
HOPE BUILDERS HOLDING LLC; HOPE
BUILDERS INC.; HOPE BUILDERS LLC;
KAUAULA LAND COMPANY LLC; KIPA
CENTENNIAL, LLC; DOUGLAS POSELEY;
DONNA ANNE POSELEY; JAMES C. RILEY
TRUST; JEANNE A. RILEY TRUST; WAINEE
LAND & HOMES, LLC; WEST MAUI LAND
COMPANY, INC.; MAKILA RANCHES INC.;
MAKILA LAND CO., LLC; MAKILA RANCHES
HOMEOWNERS ASSOCIATION, INC.; JV
ENTERPRISES, LLC; STATE OF HAWAIʻI;
HAWAII HOUSING FINANCE AND
DEVELOPMENT CORPORATION; HAWAIʻI
DEPARTMENT OF LAND AND NATURAL
RESOURCES; DOE POWER UTILITIES, 1–10;
DOE TELECOMMUNICATIONS, 1–10; DOE
PRIVATE LANDOWNERS, 1–10; and DOE STATE
LANDOWNERS, 1–10,

                    Defendants.

## <u>SECOND AMENDED COMPLAINT</u>

1.      Plaintiffs Monica I. Eder; Rede S. Eder; Bruce Baum; Sheryl Lynn Martin; Patrice Carlton; Mona Cherry; Club Sportwear, Inc. dba KaiAloha Supply; Teresa Coleman; Linda Bethell Donovan Trust; Linda Bethell Donovan; Candice Faust; Peter Faust; Kaili Faust; David Heymes; Tommy Knapp; Kronser Trust; Paul Kronser; Kristi Lynn Kronser; Jennifer Lynn McNamee; Randall Eugene McNamee; Charlene Medeiros; Charlotte Medeiros; Eric McCumber; Jonathan Melikidse; Christy Melikidse, Rose O'Leary; Steven David Potter; Timothy Putnam; Lorri Robusto; William Robusto; Kathryn Say; Aydin Say; Stardust Hawai'i dba Segway Maui; Marty Stevenson; Constance Stevenson; Kaoru Tanabe; Rolland Williams Jr.; and Jennifer Wiseman ("Plaintiffs"), in their individual and representative capacities and on behalf of a Class and Subclasses of all persons similarly situated, by their undersigned attorneys, file this Second Amended Complaint, alleging the following upon information and belief.

## <u>INTRODUCTION</u>

2.      Plaintiffs bring this lawsuit on behalf of the thousands of people who live and work in and around the town of Lahaina whose lives have been forever changed. A devastating fire roared through the former capital of the Hawaiian Kingdom on August 8, 2023, leaving utter destruction in its wake.




3.      The unfortunate truth is that this disaster could have been avoided.

4.      Despite the National Weather Service issuing a High Wind Watch and Red Flag Warning—and cautioning both that damaging winds could blow down power lines and that any fires that developed would likely spread rapidly—Defendants Maui Electric Company, Limited ("MECO"); Hawaiian Electric Company, Inc. ("HECO"); Hawaii Electric Light Company, Inc. ("HELCO"); and Hawaiian Electric Industries, Inc. ("HEI") (collectively, "HEI Defendants") inexcusably kept their power lines energized during forecasted high fire danger conditions. In addition, the HEI Defendants failed to replace their old wooden power poles, which have exceeded their useful life, sit dangerously vulnerable and in poor condition, and fail to meet the National Electric Safety Code requirement to withstand wind speeds of 105 miles per hour. The many downed power lines on August 8, 2023, not only ignited the Lahaina Fire and risked public safety, but they also caused the HEI Defendants' crews to block, congest, and divert people away from evacuation routes so that the HEI Defendants could service downed power lines.

5.      Other avoidable failures contributed to this preventable tragedy. The Telecommunications Defendants (defined, *infra*) own and operate telecommunications equipment attached to the HEI Defendants' wooden power poles on Maui. Despite their duty to properly design, construct, install, use, inspect, repair, and maintain that equipment, the Telecommunications Defendants overloaded at least some of the power poles, destabilizing them. Consequently, wooden power poles snapped, broke, and otherwise failed during the high-wind event on August 8, 2023. Some of these power pole failures caused and contributed to the ignition of multiple wildfires on Maui on August 8, 2023, including the Lahaina Fire.

6.      Once the overloaded wooden power poles fell in predicted high winds, the HEI Defendants' energized power lines fell into overgrown, highly flammable vegetation that both ignited the fire and fueled its cataclysmic spread. In fact, Defendants who own, develop, and manage land in and/or adjacent to Lahaina (defined, *infra*, as "Private Landowner Defendants" and "State Landowner Defendants") allowed invasive, nonnative vegetation—including highly flammable fountain and guinea grass—to accumulate and overrun the land. This failure to safely maintain nonnative vegetation contributed to the ignition of the Lahaina Fire, the fire's explosive

2

spread, and the blocking and slowing of the north and south escape routes from Lahaina—trapping people in the Lahaina Fire. In addition, the Private Landowner Defendants and State Landowner Defendants also failed to install fire breaks, which escalated the ferocious spread of the Lahaina Fire.

7.     And, despite extensive and specific knowledge about the great risk of wildfires on Maui in 2018 and 2019, Defendant County of Maui ("the County Defendant") took no action to eliminate or reduce identified wildfire risk factors in advance of the Lahaina Fire. During the fire, the County also failed to sound sirens, which would have prompted evacuations and mitigated the overwhelming loss of life, personal injuries, and emotional distress.

8.     The combination of the HEI Defendants' failure to deenergize their power lines and to replace their old and vulnerable wooden power poles; the Telecommunications Defendants' destabilization of the HEI Defendants' wooden power poles; the Private Landowner Defendants' and State Landowner Defendants' failure to maintain and manage the vegetation on the land where the fire started and spread; and the County's failure to implement reasonable, non-costly wildfire mitigation measures before the Lahaina Fire and to sound sirens warning people of the rapidly approaching Lahaina Fire all contributed to cause this unprecedented disaster. Together, these failures caused loss of life; serious injuries; destruction of thousands of homes and businesses; displacement of thousands of people; and damage to, and the destruction of, many of Hawai'i's treasured historic and cultural sites. This fire marks the most destructive—and deadliest—human-made disaster in Hawai'i history.

9.     More than one hundred people burned to death; officials expect the death toll to rise. Other victims suffered severe burns, smoke inhalation, and additional serious injuries, including emotional distress. Hundreds of people remain missing. The fire decimated the entire historic town of Lahaina, as homes, businesses, churches, schools, and cultural sites burned to the ground. Only ashes of those structures remain. The fire also consumed thousands of acres and left its victims suffering from severe mental and emotional stress in its wake.











10.     Initial numbers from the Pacific Disaster Center and FEMA estimate that the cost of rebuilding following damage from the Lahaina Fire is $5.52 billion.[1]

---

[1] Aya Elamroussi, *Firefighters make progress against deadly wildfires in Maui, as officials estimate it will cost billions of dollars to rebuild*, CNN, (Aug. 12, 2023), https://www.cnn.com/2023/08/12/us/maui-wildfires-hurricane-dora-saturday/index.html.

11.     HEI, the parent corporation to HECO, MECO, and HELCO, had a market cap valuation of $3.55 billion as of August 11, 2023. As of August 24, 2023, HEI's market cap valuation has suffered a precipitous decline and hovered around $1.3 billion.

12.     On August 27, 2023, HECO issued a News Release admitting the following "important fact[]": "A fire at 6:30 a.m. (the 'Morning Fire') appears to have been caused by power lines that fell in high winds." The News Release then references videos that local residents took of a downed power line, claiming, "Those videos show that power lines had fallen to the ground in high winds near the intersection of Lahainaluna Road and Hoʻokahua Street at approximately 6:30 a.m. A small fire that can be seen by the downed power lines spread into the field across the street from the Intermediate School." HECO claimed that the Morning Fire was extinguished, but "[s]hortly before 3 p.m.," HECO "crew members saw a small fire about 75 yards away from Lahainaluna Road in the field near the Intermediate School," which "spread out of control toward Lahaina."[2]

## PARTIES

13.     Plaintiffs Monica I. Eder and Rede S. Eder own a townhome located at 1400 Limahana Circle, Lahaina, Hawaiʻi on the Island of Maui.

14.     Plaintiffs Bruce Baum and Sheryl Lynn Martin own a townhome located at 12 Puailima Place, Lahaina, Hawaiʻi, on the Island of Maui, which was destroyed by the Lahaina Fire. Plaintiffs B. Baum and S. Martin suffered real and personal property loss as a result of the Lahaina Fire that started on August 8, 2023.

15.     Plaintiff Patrice Carlton owns a townhome located at 45 E. Kuu Aku Lane, Lahaina, Hawaiʻi, on the Island of Maui, which was destroyed by the Lahaina Fire. Plaintiff

_____

[2] Hawaiian Electric, *News Release: Hawaiian Electric provides update on Lahaina fires, response* (Aug. 27, 2023), https://www.hawaiianelectric.com/documents/about_us/news/2023/20230827_lahaina_fires_update.pdf.

P. Carlton suffered real and personal property damages and personal injuries, including emotional distress, as a result of the Lahaina Fire that started on August 8, 2023.

16.     Plaintiff Mona Cherry worked in Lahaina, Hawaiʻi, on the Island of Maui. Plaintiff M. Cherry suffered loss of income as a result of the Lahaina Fire that started on August 8, 2023.

17.     Plaintiff Club Sportwear, Inc., doing business as KaiAloha Supply, leased two retail stores located at 850 Front Street, Lahaina, Hawaiʻi, and 640 Front Street, Lahaina, Hawaiʻi, on the Island of Maui. Both retail stores were destroyed by the Lahaina Fire. Plaintiff Club Sportwear also leased an office and warehouse located at 222 Papalaua Street, Lahaina, Hawaiʻi, on the Island of Maui. The office and warehouse were destroyed by the Lahaina Fire. Plaintiff Club Sportwear also suffered personal property damage and loss of income as a result of the Lahaina Fire that started on August 8, 2023.

18.     Plaintiff Teresa Coleman owns a condominium located at 106 Kahoma Village Loop, Lahaina, Hawaiʻi, on the Island of Maui, which was destroyed by the Lahaina Fire. Plaintiff T. Coleman suffered real and personal property damages and personal injuries, including emotional distress, as a result of the Lahaina Fire that started on August 8, 2023.

19.     Plaintiff Linda Bethell Donovan Trust owns a townhouse located at 41 Puapake Place, Lahaina, Hawaiʻi, on the Island of Maui, which was damaged as a result of the Lahaina Fire. Plaintiff Linda Bethell Donovan Trust suffered real property loss as a result of the Lahaina Fire. Plaintiff Linda Bethell Donovan, trustee of the Linda Bethell Donovan Trust, suffered personal property loss and personal injury, including emotional distress, as a result of the Lahaina Fire that started on August 8, 2023.

20.     Plaintiff Candice Faust owns a townhome located at 41 Puapake Place, Lahaina, Hawaiʻi, on the Island of Maui, which was destroyed by the Lahaina Fire. Plaintiff C. Faust suffered real and personal property damages and personal injuries, including emotional distress, as a result of the Lahaina Fire that started on August 8, 2023. Plaintiff C. Faust's husband and

daughter, Plaintiff Peter Faust and Plaintiff Kaili Faust, also suffered both personal property damages and personal injuries, including emotional distress.

21.     Plaintiff David Heymes rents an apartment located at 1034 Front Street, Lahaina, Hawai'i, on the Island of Maui, which was destroyed by the Lahaina Fire. Plaintiff D. Heymes suffered personal property damages and personal injuries, including emotional distress, as a result of the Lahaina Fire that started on August 8, 2023.

22.     Plaintiff Tommy Knapp owns a home located at 111 Pualei, Lahaina, Hawai'i, on the Island of Maui, which was damaged in the Lahaina Fire. Plaintiff T. Knapp suffered real and personal property damages and personal injuries, including emotional distress, as a result of the Lahaina Fire that started on August 8, 2023.

23.     Plaintiff Kronser Trust owns a condominium located at 475 Front Street, Lahaina, Hawai'i, on the Island of Maui, which was damaged as a result of the Lahaina Fire. Plaintiff Kronser Trust suffered real property losses as a result of the Lahaina Fire that started on August 8, 2023. Plaintiffs Paul Kronser and Kristi Lynn Kronser, trustees of the Kronser Trust, suffered personal property losses and loss of income as a result of the same Lahaina Fire.

24.     Plaintiffs Jennifer Lynn McNamee and Randall Eugene McNamee rent a home located at 239 Front Street, Lahaina, Hawai'i, on the Island of Maui, which was destroyed by the Lahaina Fire. Plaintiffs J. McNamee and R. McNamee suffered personal property damages; business losses; and personal injuries, including emotional distress, as a result of the Lahaina Fire that started on August 8, 2023.

25.     Plaintiff Charlene Medeiros rents a condominium located at 3500 Lower Honoapi'ilani Road, Lahaina, Hawai'i, on the Island of Maui, which was destroyed by the Lahaina Fire. Plaintiff C. Medeiros suffered personal property damages and personal injuries, including emotional distress, as a result of the Lahaina Fire that started on August 8, 2023.

26.     Plaintiff Charlotte Medeiros rents an apartment located at 1034 Front Street, Lahaina, Hawai'i, on the Island of Maui, which was destroyed by the Lahaina Fire. Plaintiff Charlotte Medeiros suffered personal property damages and personal injuries, including

emotional distress, as a result of the Lahaina Fire that started on August 8, 2023.

27.     Plaintiff Eric McCumber rents an apartment located at 615 Honoapiʻilani Highway, Lahaina, Hawaiʻi, on the Island of Maui. Plaintiff E. McCumber suffered personal property damages and personal injuries, including emotional distress, as a result of the Lahaina Fire that started on August 8, 2023.

28.     Plaintiffs Jonathan Melikidse and Christy Melikidse own a home located at 100 Kahoma Village Loop, Lahaina, Hawaiʻi, on the Island of Maui, which was damaged by the Lahaina Fire. Plaintiffs J. Melikidse and C. Melikidse suffered real and personal property damages as well as personal injuries, including emotional distress, as a result of the Lahaina Fire that started on August 8, 2023.

29.     Plaintiff Rose O'Leary worked in Lahaina, Hawaiʻi, on the Island of Maui. Plaintiff R. O'Leary suffered loss of income as a result of the Lahaina Fire that started on August 8, 2023.

30.     Plaintiff Steven David Potter was driving through Lahaina, Hawaiʻi, on the Island of Maui, and was trapped by the Lahaina Fire. Plaintiff S. Potter suffered personal property damages and personal injuries, including emotional distress, as a result of the Lahaina Fire that started on August 8, 2023.

31.     Plaintiff Timothy ("Timster") Putnam rents a home located at 1497 Ainakea Road, Lahaina, Hawaiʻi, on the Island of Maui, which was damaged by the Lahaina Fire. Plaintiff T. Putnam suffered personal property damages; business losses; and personal injuries, including emotional distress, as a result of the Lahaina Fire that started on August 8, 2023.

32.     Plaintiffs Lorri Robusto and William Robusto own a home located at 57 Kahili Place, Lahaina, Hawaiʻi, on the Island of Maui, which was destroyed by the Lahaina Fire. Plaintiffs L. Robusto and W. Robusto suffered real and personal property damages as a result of the Lahaina Fire that started on August 8, 2023.

33.     Plaintiffs Kathryn Say and Aydin Say own a home located at 170 Prison Street, Lahaina, Hawaiʻi, on the Island of Maui, which was destroyed by the Lahaina Fire. Plaintiffs K.

Say and A. Say suffered real property loss and personal property loss as a result of the Lahaina Fire that started on August 8, 2023.

34.     Plaintiff Stardust Hawai'i, doing business as Segway Maui, leases a business space located at 991 Limahana Place, Lahaina, Hawai'i, on the Island of Maui, which was destroyed by the Lahaina Fire. Plaintiff Stardust Hawaii suffered personal property damages and loss of income as a result of the Lahaina Fire that started on August 8, 2023.

35.     Plaintiffs Marty Stevenson and Constance Stevenson own a home located at 55 Puapake Place, Lahaina, Hawai'i, on the Island of Maui, which was destroyed by the Lahaina Fire. Plaintiffs M. Stevenson and C. Stevenson suffered real and personal property damages as a result of the Lahaina Fire that started on August 8, 2023.

36.     Plaintiff Kaoru ("LT") Tanabe rents a condominium located at 405 Kenui Circle, Lahaina, Hawai'i, on the Island of Maui. Plaintiff K. Tanabe suffered personal property damages, business losses, and personal injuries, including emotional distress, as a result of the Lahaina Fire that started on August 8, 2023.

37.     Plaintiff Rolland Williams, Jr. rented a home in Lahaina, Hawai'i, on the Island of Maui, which was destroyed by the Lahaina Fire. Plaintiff R. Williams suffered personal property damages and business losses as a result of the Lahaina Fire that started on August 8, 2023.

38.     Plaintiff Jennifer Wiseman lives in Lahaina, Hawai'i, on the Island of Maui, and her home was destroyed by the Lahaina Fire. Plaintiff J. Wiseman suffered personal property damages, loss of income, and personal injuries, including emotional distress, as a result of the Lahaina Fire that started on August 8, 2023.

39.     Plaintiffs are informed and believe that Defendant Maui Electric Company, Limited ("MECO") is doing business in the State of Hawai'i with its principal place of business in the City of Kahului, County of Maui, State of Hawai'i.

40.     Plaintiffs are informed and believe that Defendant Hawaiian Electric Company, Inc. ("HECO") is doing business in the State of Hawai'i, in the County of Maui, with its principal place of business in the City and County of Honolulu, State of Hawai'i.

41.     Plaintiffs are informed and believe that Defendant Hawaii Electric Light Company, Inc. ("HELCO") is doing business in the State of Hawai'i, in the County of Hawai'i, with its principal place of business in the City and County of Honolulu, State of Hawai'i.

42.     Plaintiffs are informed and believe that Defendant Hawaiian Electric Industries, Inc. ("HEI") is the parent company of HECO, MECO, and HELCO, doing business in the State of Hawai'i, in the County of Maui, with its principal place of business in the City and County of Honolulu, State of Hawai'i.

43.     Plaintiffs have reviewed public and other records available in order to ascertain the true and full names and identities of all defendants in this action, but Plaintiffs have no further knowledge or information at this time regarding all responsible parties and are unable to ascertain the identity of defendants in this action designated as Doe Power Utilities 1–10. The Doe Power Utilities Defendants are sued herein under fictitious names for the reason that their true names and identities are unknown to Plaintiffs, except that they may be connected in some manner with the named Defendants, such as being agents, servants, employees, employers, representatives, co-venturers, associates, or independent contractors of Defendants and/or were in some manner presently unknown to the Plaintiffs engaged in activities such as designing, manufacturing, selling, distributing, installing and/or providing materials and/or services to Defendants. The Doe Power Utilities Defendants' true names, identities, capacities, activities, and/or responsibilities are presently unknown to Plaintiffs or their attorneys. Plaintiffs pray for leave to amend this Second Amended Complaint to show the true names and capacities, activities, and/or responsibilities when the same has been discovered.

44.     This Second Amended Complaint refers to HECO, MECO, HELCO, HEI, and the Doe Power Utilities Defendants as the "HEI Defendants."

45.     Plaintiffs are informed and believe that Defendant Hawaiian Telcom; Defendant Hawaiian Telecommunications, Inc.; and Defendant Hawaiian Telcom, Inc. (collectively, "Hawaiian Telcom") are doing business in the State of Hawai'i. Defendant Hawaiian

Telecommunications, Inc. is a corporation organized in the State of Delaware. Defendant Hawaiian Telcom, Inc. is a corporation organized in the State of Hawai'i.

46.     Plaintiffs are informed and believe that Defendant Spectrum Oceanic, LLC ("Spectrum") is doing business in the State of Hawai'i and is a limited liability corporation organized in the State of Delaware.

47.     Plaintiffs are informed and believe that Defendant Charter Communications Holding Company, LLC; Charter Communications Holding, LLC;  Charter Communications, LLC; and Charter Communications Operating, LLC (collectively, "Charter") are doing business in the State of Hawai'i. Defendant Charter Communications Holding Company, Defendant Charter Communications Holding, LLC, and Defendant Charter Communications, LLC are all limited liability corporations organized in the State of Delaware. Plaintiffs are further informed and believe that Charter is the parent company of Spectrum, that Charter manages Spectrum, and that Spectrum is the trade name for Charter.

48.     Plaintiffs have reviewed public and other records available in order to ascertain the true and full names and identities of all defendants in this action, but Plaintiffs have no further knowledge or information at this time regarding all responsible parties and are unable to ascertain the identity of defendants in this action designated as Doe Telecommunications 1–10. The Doe Telecommunications Defendants are sued herein under fictitious names for the reason that their true names and identities are unknown to Plaintiffs, except that they may be connected in some manner with the named Defendants, such as being agents, servants, employees, employers, representatives, co-venturers, associates, or independent contractors of Defendants and/or were in some manner presently unknown to the Plaintiffs engaged in activities such as designing, manufacturing, selling, distributing, installing and/or providing materials and/or services to Defendants. The Doe Telecommunications Defendants' true names, identities, capacities, activities, and/or responsibilities are presently unknown to Plaintiffs or their attorneys. Plaintiffs pray for leave to amend this Second Amended Complaint to show the true names and capacities, activities, and/or responsibilities when the same has been discovered.

49.     This Second Amended Complaint refers to Hawaiian Telcom, Spectrum, Charter, and the Doe Telecommunications Defendants as the "Telecommunications Defendants."

50.     Plaintiffs are informed and believe that Defendant Trustees of the Estate of Bernice Pauahi Bishop, operating under the registered trade name "Kamehameha Schools," is a charitable trust established for the education of Hawaiian children and the management of trust assets. Plaintiffs are further informed and believe that Kamehameha Schools is the largest private landowner in the Hawaiian islands and has a reported net worth of $8.8 billion.

51.     Plaintiffs are informed and believe that "Peter Martin & Associates" is comprised of at least the following individuals and/or entities that owned, developed, or managed land in and/or adjacent to Lahaina and that all of these entities are doing business in the State of Hawaiʻi, County of Maui: Defendant Peter Klint Martin; Defendant Peter Klint Martin Revocable Trust; Defendant Hope Builders Holding LLC; Defendant Hope Builders Inc.; Defendant Hope Builders LLC; Defendant Kauaula Land Company LLC; Defendant Kipa Centennial, LLC; Defendant Douglas Poseley; Defendant Donna Anne Poseley; Defendant James C. Riley Trust; Defendant Jeanne A. Riley Trust; Defendant Wainee Land & Homes, LLC; and Defendant West Maui Land Company, Inc.; Defendant Makila Ranches Inc.; Defendant Makila Land Co., LLC; Defendant Makila Ranches Homeowners Association, Inc. This Second Amended Complaint refers to these defendants as "The Peter Martin Defendants."

52.     Plaintiffs are informed and believe that Defendant JV Enterprises, LLC ("JV Enterprises"), is doing business in Hawaiʻi under the trade name JV Waiwai Investments. Defendant JV Enterprises is a limited liability company organized in the State of Idaho.

53.     Plaintiffs have reviewed public and other records available in order to ascertain the true and full names and identities of all defendants in this action, but Plaintiffs have no further knowledge or information at this time regarding all responsible parties and are unable to ascertain the identity of defendants in this action designated as Doe Private Landowners 1–10. The Doe Private Landowner Defendants are sued herein under fictitious names for the reason that their true names and identities are unknown to Plaintiffs, except that they may be connected

14

in some manner with the named Defendants, such as being agents, servants, employees, employers, representatives, co-venturers, associates, or independent contractors of Defendants and/or were in some manner presently unknown to the Plaintiffs engaged in activities such as designing, manufacturing, selling, distributing, installing and/or providing materials and/or services to Defendants. The Doe Private Landowner Defendants' true names, identities, capacities, activities, and/or responsibilities are presently unknown to Plaintiffs or their attorneys. Plaintiffs pray for leave to amend this Second Amended Complaint to show the true names and capacities, activities, and/or responsibilities when the same has been discovered.

54.     This Second Amended Complaint refers to Defendant Kamehameha Schools, the Peter Martin Defendants, Defendant JV Enterprises, and the Doe Private Landowner Defendants as the "Private Landowner Defendants."

55.     Plaintiffs are informed and believe that the State of Hawai'i ("State") is, and was at all relevant times herein, a State organized and existing pursuant to the laws of the United States and a political subdivision thereof. The State has the capacity to be sued for willful misconduct, gross negligence, and recklessness pursuant to HRS § 127A-9.

56.     Plaintiffs are informed and believe that the Hawaii Housing Finance and Development Corporation ("HHFDC") is, and was at all relevant times herein, a division of the State of Hawai'i whose purpose is to increase and preserve the supply of affordable and workplace housing throughout the State by providing financing and development resources. The Hawaii Housing Finance and Development Corporation, as an arm of the State, has the capacity to be sued for willful misconduct, gross negligence, and recklessness pursuant to HRS § 127A-9.

57.     Plaintiffs are informed and believe that the Hawai'i Department of Land and Natural Resources ("DLNR") is, and was at all relevant times herein, a division of the State of Hawai'i that is responsible for managing, administering, and exercising control over public lands. The Hawai'i Department of Land and Natural Resources, as an arm of the State, has the capacity to be sued for willful misconduct, gross negligence, and recklessness pursuant to HRS § 127A-9.

15

58.     Plaintiffs have reviewed public and other records available in order to ascertain the true and full names and identities of all defendants in this action, but Plaintiffs have no further knowledge or information at this time regarding all responsible parties and are unable to ascertain the identity of defendants in this action designated as Doe State Landowners 1–10. The Doe State Landowner Defendants are sued herein under fictitious names for the reason that their true names and identities are unknown to Plaintiffs, except that they may be connected in some manner with the named Defendants, such as being agents, servants, employees, employers, representatives, co-venturers, associates, or independent contractors of Defendants and/or were in some manner presently unknown to the Plaintiffs engaged in activities such as designing, manufacturing, selling, distributing, installing and/or providing materials and/or services to Defendants. The Doe State Landowner Defendants' true names, identities, capacities, activities, and/or responsibilities are presently unknown to Plaintiffs or their attorneys. Plaintiffs pray for leave to amend this Second Amended Complaint to show the true names and capacities, activities, and/or responsibilities when the same has been discovered.

59.     This Second Amended Complaint refers to the State, HHFDC, DLNR, and Doe State Landowner Defendants as "State Landowner Defendants."

60.     Defendant Maui County ("County") is, and was at all times relevant herein, a municipality organized and existing pursuant to the laws of the State of Hawaiʻi and a political subdivision thereof. The County Defendant has the capacity to be sued for willful misconduct, gross negligence, and recklessness pursuant to HRS § 127A-9.

61.     This Second Amended Complaint refers to the HEI Defendants, the Telecommunications Defendants, the Private Landowner Defendants, the State Landowner Defendants, and the County, collectively, as "Defendants."

## JURISDICTION

62.     All incidents described herein took place in Hawaiʻi, within the jurisdiction of this Court, and the amount in controversy meets or exceeds the jurisdictional limit of this Court.

63.     The Court has subject matter jurisdiction pursuant to HRS § 603-21.5.

64.     Venue is proper pursuant to HRS § 603-36(5).


## GENERAL ALLEGATIONS

### *Commonly Known Fire Risk on Maui*

65.     All Defendants knew about the serious risk of wildfires on Maui. All Defendants knew that high winds had toppled power lines in the past, triggering wildfires. And all Defendants knew that the dry, nonnative grasses surrounding Lahaina and on other parts of Maui were capable of rapidly spreading those wildfires.

66.     The threat of hurricanes and their attendant high winds invariably loom over Hawai'i and are common knowledge throughout Hawai'i. A handful of hurricanes endanger the State each year. Climate change makes hurricanes more ferocious, increasing the peril for Hawai'i statewide.

67.     Since 2000, at least 22 hurricanes or their remnants have either impacted or nearly impacted Hawai'i, thirteen of which occurred since 2010. In recent years, dozens of hurricanes or tropical storms made landfall or passed within miles of Hawai'i's shores.

68.     The frequency of brush fires on Maui is also common knowledge, particularly in late summer and fall when the endemic nonnative grasses dry out and turn most of Maui from green to brown. Every year, multiple brush fires break out across Maui, burning dozens, hundreds, or thousands of acres at a time and burning homes, businesses, and/or personal property. It is impossible to live, work, or own land on Maui without knowing that serious brush fires occur every year and that these fires spread rapidly in Maui's dry, nonnative grasses.

69.     Nearly a decade ago, the Hawaii Wildfire Management Organization issued a 2014 wildfire mitigation plan, warning that Lahaina was among Maui's most fire-prone areas based on its proximity to grasslands, steep terrain, and frequent winds. The Hawaii Wildfire

Management Organization outlined a plan for working with utilities to help reduce the risk of fires.[3]

70.     In August 2018, winds from Hurricane Lane ignited a fire that raged in the Kauaʻula Valley in West Maui, uphill from Lahaina. That fire tore through fallow agricultural land near the same type of fallow agricultural land that fueled the Lahaina Fire. The Hurricane Lane fires burned 21 houses, 27 cars, and more than 2,100 acres; displaced a few dozen people; and caused more than $4.3 million in damage. Thankfully, no one died in the blaze.[4]

71.     Just days after the Hurricane Lane fires, Maui residents raised many concerns with the then-mayor of Maui and State and County officials at a public meeting: "Why didn't Maui Electric shut off the power given the high winds and their equipment having caused other fires? Why didn't emergency staff sound their all-hazard sirens?" These questions raise the very same problems that led to and worsened the Lahaina Fire and its attendant impacts.[5]

72.     At the same 2018 public meeting, residents complained that fire hydrants ran out of water, something the fire chief could not explain. The hydrants also ran out of water during the Lahaina Fire five years later.[6]

73.     Again, at the 2018 town hall, residents questioned County and State officials about why they did not blare the All-Hazard Statewide Outdoor Warning Siren System ("Sirens") to warn residents about the 2018 fire. A staffer responded, "Currently we don't have a protocol for sounding sirens for fires, but it doesn't mean it isn't something we can look at." The Sirens also sat silent during the Lahaina Fire five years later.[7]

---

[3] Dan Frosch & Jim Carlton, *Hawaii Officials Were Warned Years Ago that Maui's Lahaina Faced High Wildfire Risk*, WALL STREET JOURNAL, (Aug. 11, 2023), https://www.wsj.com/articles/hawaii-maui-fire-risks-plans-government-e883f3a3.

[4] Brianna Sacks & Justice McDaniel, *A terrifying fire struck Maui in 2018. Officials were warned of a repeat*, WASHINGTON POST, (Aug. 22, 2023), https://www.washingtonpost.com/weather/2023/08/22/maui-fire-2018-lahaina-warning/.

[5] *Id.*

[6] *Id.*

[7] *Id.*

74.     At the very same 2018 meeting, residents asked County and State officials, "If the wind exceeds a certain amount, is Maui Electric required to shut down?" "Those wires are whipping up there. And that was the cause of the fire." Officials responded, "That was not a conversation that was had" and confirmed MECO did not have a protocol in place to shut down power in advance of high winds. Preceding and during the Lahaina Fire, the HEI Defendants still did not have a protocol in place to shut down the power during high winds, five years later.[8]

75.     In 2019, the Hawaii Wildfire Management Organization published a report entitled, "A Collaborative, Landscape-Level Approach to Reduce Wildfire Hazard Across Hawaii, 2018–19 Vegetation Management Rapid Mapping Assessment and Collaborative Action Planning – Maui Report." This report contains multiple recommendations to reduce the risk of a wildfire in Lahaina, including fuel reduction; replacing invasive, fire-promoting grasses to less flammable species; and the construction of fire breaks in the area where the Lahaina Fire started.[9]

76.     In fact, former top Hawaiian forestry official, Michael Buck, shared a letter with Hawaiʻiʻs wildfire prevention community after the Lahaina Fire. In that letter, he lamented, "No landowner, public or private, should be allowed for any reason to maintain hundreds of acres of flammable grass and fuel that threaten the lives of citizens" and that "[t]he Lahaina Fire was an avoidable tragedy."[10]

---

[8] *Id.*

[9] County of Maui, State of Hawaiʻi, Cost of Government Commission, *Report on Wildfire Prevention and Cost Recovery on Maui, Exhibit D: Hawaii Wildfire Management Association*, A *Collaborative Landscape-Level Approach to Reduce Wildfire Hazard Across Hawaiʻi: 2018– 2019 Vegetation Management — Rapid Mapping Assessment and Collaborative Action Planning — Maui Report* (July 2021), https://www.mauicounty.gov/DocumentCenter/View/129491/Report-on-Wildfire-Prevention--Cost-Recovery-on-Maui---Part-4-Exhibit-D-25-MB, pp. 1, 4, 9, 11, 17, 18, 19, 20, 21, 25, 27

[10] Dan Frosch, Zusha Elinson, Jim Carlton & Christine Mai-Duc, *Everybody Knew the Invasive Grass of Maui Posed a Deadly Fire Threat, but Few Acted*, WALL STREET JOURNAL, (Aug. 25, 2023), (https://www.wsj.com/us-news/climate-environment/maui-fire-invasive-grass-cf6dbca2).

77.     According to Clay Trauernight, a fire scientist at the University of Hawaii at Manoa, highly flammable grasses, such as buffelgrass and guinea grass, both native to Africa, have grown unchecked on Maui, ultimately dominating native species. These invasive grasses amount to between eight and twenty tons an acre on the island, compared with just one or two tons in open areas of the U.S. mainland. He explained, "You get this explosive fire growth because there is just so much" highly flammable grass.[11]

78.     In 2020, researchers from the University of Hawaii and the East-West Center connected the 2018 fires on Maui and Oʻahu to winds from Hurricane Lane.

79.     That 2020 report, entitled "Fire and Rain: The Legacy of Hurricane Lane in Hawaiʻi," published in the *American Meteorological Society's Journal*, found that neither thunderstorms nor lightning started the 2018 fires on Maui and Oʻahu. The Honolulu Fire Department attributed the Oʻahu fire to power lines arcing in Hurricane Lane's high winds. The fires on Maui, including in the Kauaʻula Valley in West Maui, uphill from Lahaina, "required significant suppression resources," which included more than 70 County firefighters and additional support from State airport fire crews.[12]

80.     The County Defendant was also fully aware of the potential for devastating wildfires since at least 2020—if not sooner given the 2018 and 2019 fires on Maui.

81.     In 2020, the Maui County Hazard Mitigation Plan Update warned that "[i]t is assumed that all current and future buildings, critical facilities, and populations in Maui County are at risk to wildfire." Even more specific, the 2020 Maui County Hazard Mitigation Plan Update depicts Lahaina and all Lahaina buildings as occupying a "High" Wildfire Risk Area:[13]

---

[11] *Id.*

[12] Alison D. Nugent, Ryan J. Longman, Clay Trauernicht, Matthew P. Lucas, Henry F. Diaz, and Thomas W. Giambelluca, *Fire and Rain: The Legacy of Hurricane Lane in Hawaiʻi*, (June 2020), https://journals.ametsoc.org/view/journals/bams/101/6/BAMS-D-19-0104.1.xml.

[13] Maui Emergency Management Agency, County of Maui, Hawaiʻi, *Hazard Mitigation Plan Update* (August 2020), https://www.mauicounty.gov/DocumentCenter/View/125977/2020-Maui-County-Hazard-Mitigation-Plan-Final, pp. 489, 503.



Maui County Hazard Mitigation Plan Update



*Figure 256. Buildings in Wildfire Risk Areas in Southern West Maui Community Planning Area.*

82.     The Mitigation Plan Update also warned that West Maui had a "Highly Likely (greater than 90% annual chance)" probability of experiencing wildfires:[14]

Fire data indicated 80 wildfires directly impacted Maui County between 1999 and 2019. This results in approximately four fires every year occurring within the county overall. However, not all of Maui County's community planning areas have the same likelihood of experiencing wildfires. The table below shows the annual probability for the wildfire hazard for each community planning area.

*Table 68. Wildfire Probabilities for Maui County Community Planning Areas.*

| Community Planning Area | Landslide Probability |
|---|---|
| Hāna | Likely (10% to 90% annual chance) |
| Kīhei-Mākena | Likely (10% to 90% annual chance) |
| Lāna'i | Possible (1% to 10% annual chance) |
| Makawao-Pukalani-Kula | Likely (10% to 90% annual chance) |
| Moloka'i | Likely (10% to 90% annual chance) |
| Pā'ia-Ha'ikū | Likely (10% to 90% annual chance) |
| Wailuku-Kahului | Likely (10% to 90% annual chance) |
| West Maui | Highly Likely (greater than 90% annual chance) |

---

[14] *Id.* Table 68 in the Hazard Mitigation Plan Update appears to mistakenly label the column depicting "the probability of a wildfire hazard" as "Landslide Probability."

83.     In July 2021, the County's Cost of Government Commission ("Commission") issued a Report on Wildfire Prevention and Cost Recovery on Maui ("Wildfire Prevention Report"). The Commission "helps the County promote economy, efficiency, and improved service to the public by reviewing existing County operations and policies and making recommendations to improve them." The Commission "[s]ubmits an annual report of its findings and recommendations to the Mayor and Council."[15]

84.     Following Maui's unprecedented wildfire season in 2019, the Commission decided "to examine the County's wildfire prevention and response practices and costs," given its interest "in identifying the current and potential future costs associated with firefighting response and prevention for the County." The July 2021 Wildfire Prevention Report cataloged the findings of that investigation.[16]

85.     The July 2021 Wildfire Prevention Report specifically warned about the threats that wildfires posed to the State of Hawai'i and, specifically, to Maui, including the following:

- "[T]he number of incidents from a combination of wild/brush/forest fires appears to be increasing, and that this increase poses an increased threat to citizens, properties, and sacred sites;"

- "Island communities are particularly vulnerable because populations tend to be clustered and dependent on single highways, often located on the island edge;"

- "Escape routes and evacuation locations and resources for populations impacted by fire incidents are also impeded by fire incursions;"

- "Importantly, Hawaii's and Maui's fire problem is more extreme than on the U.S. mainland;" and

---

[15] County of Maui, State of Hawai'i, Cost of Government Commission, https://www.mauicounty.gov/179/Cost-of-Government-Commission, (last visited Aug. 24, 2023).

[16] County of Maui, State of Hawai'i, Cost of Government Commission, *Report on Wildfire Prevention and Cost Recovery on Maui*, (July 2021), https://www.mauicounty.gov/DocumentCenter/View/129493/Report-on-Wildfire-Prevention--Cost-Recovery-on-Maui---Part-1-Report--Exhibits-A-B-33-MB, p. 1.

- "As of June 22, 2021, the U.S. Drought Monitor designated all of Maui Island as either in a 'moderate drought' or 'severe drought.'"[17]

86.    The Wildfire Prevention Report also included data showing that fires will continue increasing in frequency and severity; exhibits depicting which Maui communities were the most vulnerable to wildfires (including Lahaina); and the activities that increase wildfire risk (such as power lines):[18]



---

[17] *Id.* at pp. 1–3.

[18] *Hawaii Wildfire Management Association*, A *Collaborative Landscape-Level Approach to Reduce Wildfire Hazard Across Hawai'i: 2018–2019 Vegetation Management — Rapid Mapping Assessment and Collaborative Action Planning —Maui Report*, *supra*, https://www.mauicounty.gov/DocumentCenter/View/129491/Report-on-Wildfire-Prevention--Cost-Recovery-on-Maui---Part-4-Exhibit-D-25-MB, at pp. 2, 7–8.



87.     The Wildfire Prevention Report also identified several problems and actionable

solutions that would have lessened the risk of the Lahaina Fire, such as the "[r]eduction of alien

plant life that serves as fuel" through the implementation of "an aggressive plan to replace these

hazardous fuel sources with native plants to reduce combustible fuel while increasing water

retention." The Wildfire Prevention Report also explained that "[a]boveground power lines that

fail, short, or are low hanging can cause fire ignition (sparks) that could start a wildfire,

particularly in windy or stormy conditions," which "is exacerbated by overgrown areas in the

rights of way beneath the lines." The Wildfire Prevention Report identified responsive action to

the problems posed by power lines, which included routine inspections of "power transmission

lines and rights of way" and tasking both the County and "electric utility companies with corrective actions," like "infrastructure upgrades" and fuel reduction.[19]

88.     The Wildfire Prevention Report also concluded that creating additional fines or penalties for causing wildfires was unnecessary, in part, because wildfire victims and survivors could sue for negligence.[20]

89.     Notably, the Wildfire Prevention Report found that the recommended fire prevention measures would not dramatically increase costs for the County, in part, because for Fiscal Year 2011 to Fiscal Year 2020, Maui's fire/rescue operations budget increased "almost $4,000,000 above inflation, to meet increasing firefighting requirements" and because "pressure on current firefighting budgets is offset by federal grants that can be accessed if fire costs exceed budgetary levels."[21] Thus, budgetary constraints do not explain the County Defendant's failures.

90.     The Maui Charter requires the Commission to provide the Wildfire Prevention Report to Maui's Mayor, County Council, and County Auditor.[22]

91.     Thus, the County Defendant was on direct notice of the substantial risk that wildfires pose to Maui and the methods by which it could prevent these wildfires years prior to the Lahaina Fire; heeding the warnings and recommendations in the Wildfire Prevention Report could have prevented and/or drastically reduced the destructive impact of the fire.

92.     Despite the numerous, detailed warnings and recommendations the Commission provided to Maui more than two years before the Lahaina Fire, the County Defendant nevertheless failed to  adopt appropriate wildfire prevention measures.

93.     The HEI Defendants also had specific knowledge of the risk of wildfire on Maui. In fact, HEI submitted a 2022 request for funding from the public utilities commission to offset

---

[19] *Report on Wildfire Prevention and Cost Recovery on Maui*, *supra*, https://www.mauicounty.gov/DocumentCenter/View/129493/Report-on-Wildfire-Prevention--Cost-Recovery-on-Maui---Part-1-Report--Exhibits-A-B-33-MB, at pp. 11–12.

[20] *Id.* at pp. 4, 6.

[21] *Id.* at pp. 2, 6.

[22] Charter, County of Maui, Section 3-9.3(3) (2023 ed.).

the $189.7 million HEI would need to spend to bolster its power grid statewide, which included wildfire-prevention measures.[23]

94.     Jennifer Potter, who resigned from the Hawaii Public Utilities Commission in October 2022, and who lived in Lahaina on Maui, confirmed that the HEI Defendants knew about the wildfire risk to Maui: "There was absolutely knowledge within the state and within the electric industry that fire was a huge, huge concern on the island of Maui, and even more so than any of the other islands[.]"[24]

95.     In fact, the HEI Defendants indicated in their funding request that "[t]he risk of a utility system causing a wildfire ignition is significant" and that the HEI Defendants sought funding, in part, to guard against their facilities being "the origin or a contributing source of ignition for a wildfire."[25]

96.     Finally, the Private Landowner Defendants and State Landowner Defendants knew, or should have known, about the acute risk of wildfire on their land on Maui. The Private Landowner Defendants and State Landowner Defendants knew that their fallow agricultural land had been overtaken by dry, nonnative grasses. They also knew, or had reason to know, that wildfires ravaged similar fallow agricultural land on Maui on multiple prior occasions, including as recently as 2018 when Hurricane Lane triggered fires that exploded through 2,100 acres of nonnative grasses in the same region where they own, develop, and manage their land. In fact, David Bowman, a professor of pyrogeography and fire science at the University of Tasmania

---

[23] Frosch & Carlton, *supra*, https://www.wsj.com/articles/hawaii-maui-fire-risks-plans-government-e883f3a3.

[24] *Id.*

[25] Brianna Sacks, *Hawaii utility faces scrutiny for not cutting power to reduce fire risks*, THE WASHINGTON POST, (Aug. 12, 2023), https://www.washingtonpost.com/climate-environment/2023/08/12/maui-fire-electric-utility/?utm_campaign=wp_post_most&utm_medium=email&utm_source=newsletter&wpisrc=nl_most.

described the situation in Lahaina this way: "The town was basically surrounded by a powder keg waiting to go off with a spark."[26]

97.     "The hills above Lahaina's history downtown have been surrounded by nonnative grasses for more than a century." It is well know that "[t]he grasses — relics of the sugar cane plantations in the area that largely shuttered in 1999 — dried out the landscape" and that those grasses "grew taller after winter rains." Every year, the grasses "grew taller after winter rains," then "[b]rushfires would sweep through and the species adapted and regrew, crowding out native grasses and moving close to homes." Sadly, a *Washington Post* investigation has revealed that "the geographic spread and density of nonnative grasses were key elements to creating a fast-moving, uncontrollable fire" that ultimately wiped out Lahaina.[27]

98.     Activists and experts have been sounding the alarm about the fire risk associated with nonnative, invasive, and highly flammable grasses since at least 2018, describing the land around Lahaina as a "vast swath of vegetated fuels" and warning that landowners had "let these lands turn into match sticks." As discussed, wildfire experts in Hawaiʻi had named vegetation management and nonnative grasses as vital to mitigating fire risk on Maui.[28]

---

[26] Imogen Piper, Joyce Lee, Elahe Izadi & Brianna Sacks, *Maui's neglected grasslands caused Lahaina fire to grow with deadly speed*, WASHINGTON POST, Sept. 2, 2023), https://www.washingtonpost.com/investigations/interactive/2023/lahaina-wildfires-invasive-grass-destruction/.

[27] *Id.*

[28] *Id.*

99.    The Private Landowner Defendants and State Landowner Defendants are the three main owners of the fields where the fires started on August 8, 2023. The following graphic, created by reporters at the *Washington Post*, depicts the "Ownership of burnt nonnative grassland in Lahaina:[29]



---

[29] *Id.*

100.    None of these Private Landowner Defendants or State Landowner Defendants appears to have engaged with the Hawaii Wildfire Management Organization 2014 wildfire mitigation plan or the 2019 Hawaii Wildfire Management Organization's Report—that specifically addressed landscaping and vegetation management on Maui.[30]

### *Specific Warnings Preceding Lahaina Fire*

101.    On Friday, August 4, 2023, the National Weather Service in Honolulu ("NWS") posted on X, formerly known as Twitter, that Hawai'i could experience "indirect impacts" from Hurricane Dora from Monday, August 7, 2023 through Wednesday, August 9, 2023, including "Strong and gusty trade wins" and "Dry weather & high fire danger."



102.    Two days later, on Sunday, August 6, 2023, NWS posted a warning on X: "Strongest winds in yellows & oranges on map result from significant pressure differences

---

[30] *Id.*

between high & low pressures. Combined w/ dry conditions, these winds pose a serious fire & damaging wind threat. Stay alert!" NWS also posted an update on Hurricane Dora on X, which included the following warning: "While Hurricane Dora passes well south with no direct impacts here, the strong pressure gradient between it & the high pressure to the north creates a threat of damaging winds & fire weather (due to ongoing dry conditions) from early Mon to Wed."



103.    On Monday, August 7, 2023, NWS issued an updated warning for the Hawaiian Islands, as reported in *The Maui News*. This warning contained both a High Wind Watch and a Fire Warning for the leeward portions of the State, which included Lahaina. The warning

cautioned that damaging winds could blow down power lines and that any fires that developed would likely spread rapidly.[31]

104.    On Tuesday, August 8, 2023, the NWS issued both a High Wind Warning and Red Flag Warning for portions of the Hawaiian Islands, including West Maui. Specifically, the NWS warned the following: "High Wind: 30–45 mph winds, gusts up to 60 mph . . . . Red Flag: High fire danger with rapid spread. NO outdoor burning. Stay safe & cautious!"



---

[31] *National Weather Service issues high wind watch, fire warning in effect through late Tuesday*, MAUI NEWS, (Aug. 7, 2023),

https://www.mauinews.com/news/local-news/2023/08/national-weather-service-issues-high-wind-watch-fire-warning-in-effect-through-late-tuesday/.

105.    Per NWS, a Red Flag Warning "means that critical fire weather conditions are either occurring now or will shortly. A combination of strong winds, low relative humidity, and warm temperatures can contribute to extreme fire behavior."

106.    Despite the HEI Defendants' knowledge about these Red Flag and other warnings, they left their power lines energized. These power lines foreseeably ignited the fast-moving, deadly, and destructive Lahaina Fire, which destroyed homes, businesses, churches, schools, and historic and cultural sites. The fire killed scores of people and ruined hundreds—if not thousands—of lives.

107.    This deadly fire also displaced thousands of people, who lost their homes, forcing them to live in shelters, campgrounds, hotels, and cars.

108.    Defendants knew that the high winds that NWS predicted would topple power poles, knock down power lines, and ignite vegetation. The Defendants also knew that if the HEI Defendants' overhead electrical equipment started a fire, it would spread at a critically fast rate to the Plaintiffs' and Putative Class Members' properties, without warning and without sufficient time for them to safely evacuate themselves and their loved ones, to gather their pets, or to collect their other possessions. The Defendants also knew that downed power lines would make roads impassable, blocking limited evacuation routes.

109.    The HEI Defendants also knew that their overhead electrical infrastructure did not use available technologies to mitigate fire risk, including non-expulsion fuses, covered conductors, underground power lines, composite power poles, and fiberglass and other non-wood materials.

110.    On August 8, 2023, at approximately 6:37 a.m., someone reported a brush fire near Lahainaluna Road. Authorities ordered evacuations minutes later, at 6:40 a.m., in the area

surrounding Lahaina Intermediate School and closed Lahainaluna Road between Kelawea Street and Kuialua Street.[32]

111.    At approximately 9:00 a.m. on August 8, 2023, the Maui Fire Department declared the three-acre Lahaina brush fire 100% contained. However, power outages negatively impacted the ability to pump water, so authorities asked the public to conserve water in West Maui. The authorities kept Lahainaluna Road closed between Kelawea and Kuialua Streets, while HEI responded to a downed power line in the area.[33]

112.    Later the same day, at 4:45 p.m., *Maui Now* reported that "[a]n apparent flareup of the Lahaina Fire forced the closure of Lahaina Bypass around 3:30 p.m. Evacuations are occurring in the vicinities of Lahainaluna Road, Hale Mahaolu and Lahaina Bypass . . . . Multiple roads, including Honoapiʻilani Highway from Hokiokio Place to Lahaina Bypass, are closed due to downed power lines."[34]

113.    Together, the initial fire that started on August 8, 2023, at 6:37 a.m. and the later flare-ups of that fire at 9:30 a.m. and 4:45 p.m. comprise the Lahaina Fire.

114.    The Lahaina Fire caused and/or contributed to the destruction of the town of Lahaina, killing scores of people and destroying hundreds of homes and businesses.

---

[32] *Fire crews battling brush fire in Lahaina; residents in area evacuated,* MAUI NOW, (Aug 8, 2023), https://mauinow.com/2023/08/08/haleakala-highway-closure-due-to-brush-fire-evacuation-of-kula-200-off-auli%CA%BBi-dr/; *Lahaina Inferno Began After Firefighters Departed a 'Contained' Scene*, THE NEW YORK TIMES, (Aug. 23, 2023), https://www.nytimes.com/2023/08/23/us/hawaii-maui-lahaina-fire-contained.html.

[33] *Lahaina fire declared 100% contained; water conversation urged due to power outages*, MAUI NOW, (Aug. 8, 2023), https://mauinow.com/2023/08/08/haleakala-highway-closure-due-to-brush-fire-evacuation-of-kula-200-off-auli%CA%BBi-dr/.

[34] *Evacuation orders for part of Lahaina due to apparent flareup of West Maui fire*, MAUI NOW, (Aug. 8, 2023), https://mauinow.com/2023/08/08/haleakala-highway-closure-due-to-brush-fire-evacuation-of-kula-200-off-auli%CA%BBi-dr/.

115.     The Google Earth map image below depicts the location where the Lahaina Fire reportedly started (the "Area of Origin"). One of the HEI Defendants' power substations is located near where both the initial three-acre fire started and where authorities reported a downed power line early on August 8, 2023.



116.     The image below is an aerial view of the Area of Origin:



117.    The HEI Defendants owed a duty to design, construct, inspect, repair, and adequately maintain their power poles, power lines, transformers, reclosers, and other electrical equipment. The HEI Defendants also owed a duty to properly maintain and operate their power lines, overhead electrical infrastructure, and equipment to ensure they would not cause a fire. These duties included deenergizing their power lines during Red Flag Warnings to prevent fires and conducting adequate vegetation management, such as clearing vegetation, trees, and tree limbs that could come in contact with power lines and equipment. In addition, the HEI Defendants knew that their electrical infrastructure was inadequate, aging, and/or vulnerable to foreseeable and known weather conditions. The HEI Defendants failed to fulfill each of these duties.

118.    As electric utility companies, the HEI Defendants were engaged in a dangerous activity and, accordingly, owed the public a heightened duty of care to avoid foreseeable risks attendant to this activity, including the risk of fire. This heightened duty included exercising a very high degree of care and prudence, such as ensuring the safe transmission of electricity over their infrastructure during high-wind events and monitoring weather conditions that would affect their electrical infrastructure (i.e., forecasted high winds and Red Flag Warnings). The HEI Defendants also owed the public a duty to mitigate damage to their electrical infrastructure from high winds, specifically, to prevent a wildfire. Defendants further owed a duty to design and construct their power poles and power lines to perform safely and not fail during foreseeable wind events that would endanger Plaintiffs' and Putative Class Members' lives and property.

119.    Unfortunately, the HEI Defendants failed to take these steps, and on August 8, 2023, *Hawaii News Now* reported that "[m]ore than 30 downed power poles" were "reported on Maui."[35]

---

[35] Kiana Kalahele, *More than 30 downed power poles reported on Maui; thousands without power*, HAWAII NEWS NOW, (Aug. 8, 2023), https://www.hawaiinewsnow.com/2023/08/08/strong-winds-knock-out-power-thousands-statewide/.

120.    *Maui Now* reported that Defendants were working to restore power to 12,400 customers and reminded readers that they should assume a downed power line "is energized and dangerous." The same article included depictions of downed, leaning, and/or damaged power poles, many touching vegetation below them.[36]






121.    The practice of deenergizing power lines during fire weather conditions is commonplace in the Western United States. California utilities, such as Southern California Edison Company, Pacific Gas & Electric, and San Diego Gas & Electric, all have implemented Public Safety Power Shutoffs ("PSPS") during Red Flag and High Wind conditions. These utilities have been using PSPS for years to prevent wildfires.

---

[36] *High winds result in power outages to thousands in West Maui, Olinda Piʻiholo*, Maui Now, (Aug. 8, 2023), https://mauinow.com/2023/08/08/high-winds-result-in-power-outages-in-west-maui-olinda-pi%CA%BBiholo-and-moloka%CA%BBi/.

122.    In 2019, the HEI Defendants issued a press release, attached as Exhibit A ("2019 Press Release"). In the 2019 Press Release, the HEI Defendants expressed their commitment to conduct drone surveys across their five-island territory to identify areas vulnerable to wildfires and to determine the best course of action to protect the public and electrical infrastructure. Further, the 2019 Press Release stated that the drone inspections formed part of the HEI Defendants' "proactive assessment and management of vegetation near their electrical infrastructure, especially in drought-prone or dry bush areas." The 2019 Press Release also stated that HEI, MECO, and HELCO evaluated and studied the Wildfire Mitigation Plans that the major California utilities had filed with the California Public Utilities Commission. These Wildfire Mitigation Plans included a PSPS program for shutting off the power to their power lines during High Wind and Red Flag conditions to prevent wildfires.

123.    The HEI Defendants never created a PSPS plan. According to *The Washington Post*, HEI Defendants were "aware that a power shut-off was an effective strategy, documents show, but had not adopted it as part of its fire mitigation plans, according to [HEI] and two former power and energy officials" the paper interviewed. The HEI Defendants knew shutting off power is "a successful way to prevent wildfires when additional robust techniques are not in place."[37]

124.    Ms. Potter, the former member of the State's public utilities commission, described the HEI Defendants as "not as proactive as they should have been" and criticized them for not taking meaningful steps to address their "inadequacies in terms of wildfire."[38]

125.    In fact, according to *The Washington Post*, "Hawaii is powered by a grid that uses old wooden poles that are largely uninsulated and strung with lush vegetation over miles of rugged terrain, according to utility specialists," and "residents and energy experts said they have

---

[37] Sacks, *supra*, https://www.washingtonpost.com/climate-environment/2023/08/12/maui-fire-electric-utility/?utm_campaign=wp_post_most&utm_medium=email&utm_source=newsletter&wpisrc=nl_most.

[38] *Id.*

long called for the utility to harden its grid, and despite the cost, to put more of it underground."[39]

126.     Michael Wara, a wildfire expert who directs the Climate and Energy Policy Program at Stanford University said the pattern of the Lahaina Fire "suggests that a spate of small ignitions combined to form a bigger blaze" and "'the only real source of that is power lines.'"[40]

127.     The catastrophic losses from the Lahaina Fire could have been prevented had the HEI Defendants implemented a PSPS prior to the fire starting and taken other reasonable steps to prevent their electrical equipment from igniting the fire.

128.     In addition, the Mayor of Maui noted that downed power poles added to the chaos surrounding the Lahaina Fire, as downed power poles with live wires still attached cut off two important roads, leaving only the narrow highway passable.[41]

129.     Pursuant to a Pole Licensing Agreement, the Telecommunications Defendants own and operate telecommunications equipment attached to the HEI Defendants' wooden power poles located on Maui. The Telecommunications Defendants owed a duty to properly design, construct, install, use, inspect, repair, and adequately maintain their telecommunications equipment attached to the HEI Defendants' wooden power poles in a way that would not overload those poles and cause them to break, snap, and fail during a high wind-event, like the High Wind Watch and Red Flag Warning that occurred on August 8, 2023. Unfortunately, the Telecommunications Defendants breached these duties by overloading some of the HEI

---

[39] *Id.*

[40] *Id.*

[41] Ty O'Neil, Claire Rush, Jennifer Sinco Kelleher & Rebecca Boone, *Maui residents had little warning before flames overtook town; at least 55 people died*, abc7: EYEWITNESS NEWS, (Aug. 11, 2023), https://abc7.com/hawaii-wildfire-wildfires-strong-winds-maui/13632163/; Brianna Sacks, *Hawaii utility faces scrutiny for not cutting power to reduce fire risks*, THE WASHINGTON POST, (Aug. 12, 2023), https://www.washingtonpost.com/climate-environment/2023/08/12/maui-fire-electric-utility/?utm_campaign=wp_post_most&utm_medium=email&utm_source=newsletter&wpisrc=nl_most.

Defendants' wooden power poles and causing them to become unstable, resulting in power poles snapping, breaking, and failing during the high-wind event on August 8, 2023. These failures both ignited multiple wildfires on Maui on August 8, 2023, including the Lahaina Fire, and contributed to the spread of the Lahaina Fire.

130.    Specifically, the HEI Defendants' Pole Number 7A was overloaded with power and telecommunications equipment long before August 8, 2023. In October 2019, Google's Street View photography captured the following photograph of Pole Number 7A, which shows both that HEI Defendants and the Telecommunications Defendants improperly and unsafely installed, tensioned, and maintained equipment and that the wooden power pole was subsequently leaning and in a continuous, downhill pull:



As is set forth in more detail below, Pole Number 7A snapped and fell on August 8, 2023, initiating this tragedy.

131.    Moreover, the Private Landowner Defendants and State Landowner Defendants owed a duty to perform adequate vegetation management on their land, including fuel reduction, conversion of highly-flammable nonnative invasive grasses to less flammable vegetation, and to install fire breaks—all of which would prevent the dangerous spread of a wildfire from their land to neighboring properties. The Private Landowner Defendants and State Landowner Defendants breached these duties, contributing to the ignition of the Lahaina Fire, the catastrophic spread of the Lahaina Fire, and the blocking and slowing of evacuation routes, which trapped people in the Lahaina Fire.

132.    The County Defendant owed a duty to implement any and all fire prevention measures and emergency response services reasonably available. The County Defendant breached its duties to its residents by, among other things; failing to properly maintain vegetation in the County, especially in close proximity to power lines; failing to create and implement an aggressive plan to reduce nonnative plants on Maui; failure to implement routine inspection of power transmission lines and to work with the HEI Defendants on infrastructure upgrades; and failure to activate the existing All Hazard Emergency Sirens to give evacuation warnings.

133.    In addition to these failures, the County Defendant failed to utilize its Sirens to warn people of the inferno tearing through Lahaina. Prior to the Lahaina Fire, the County Defendant's website stated that "[t]he all-hazard siren system can be used for a variety of both natural and human-caused events; including tsunamis, hurricanes, dam breaches, flooding, *wildfires*, volcanic eruptions, terrorist threats, hazardous material incidents, and more."[42] But the County Defendant failed to sound the Sirens, thus, failing to warn people about the Lahaina Fire—a decision with grave and devastating consequences.

---

[42] County of Maui Outdoor Warning Siren testing, All-Hazard Statewide Outdoor Warning Siren System: Testing, Reporting, and Information for Maui County Sirens, https://www.mauisirens.com (last visited Sept. 3, 2023) (emphasis added).

134. Defendants' collective failures have caused Plaintiffs, the Putative Class and Subclass Members, and their communities to suffer devastating property damage; economic losses; and disruption of their homes, businesses, livelihoods, and mental well-being. Life will never be the same for the thousands of victims and survivors of the Lahaina Fire.

### *Sequence Of Events That Caused the Lahaina Fire*

135. At approximately 3:00 a.m. on August 8, 2023, the HEI Defendants' Pole Number 7A snapped near its base and fell, causing damage to the cross-arms of adjacent Pole Number E7B. Cross-arms are the wooden "T" sections attached to the top of power poles that support the power lines. The damage that Pole Number 7A caused to the cross-arms of Pole Number E7B caused an electrical fault and power outage in the area. An electrical fault occurs when an energized line comes into contact with a foreign object, causing the electrical current to be interrupted, usually resulting in a fuse or recloser device shutting off power.

136. The reason Pole Number 7A snapped and fell, causing damage to the cross-arms of Pole Number E7B was (1) because the HEI Defendants failed to properly design, inspect, and maintain these poles; and (2) the Telecommunications Defendants overloaded the wooden power poles by tensioning their telecommunications cables attached to one side of these poles too tightly, thus, causing the poles to lean from a straight and upright position. This tension on the poles and their subsequent leaning subjected the poles to more shear force from high winds than the poles would have experienced if they had remained in a straight and upright position.

137. A young woman named Laʻi, who lived in Lahaina, woke up suddenly around 3:00 a.m. when something bright flashed outside the second-story window of her home, located on Lahainaluna Road near one of the HEI Defendants' substations.[43] This bright flash Laʻi witnessed was likely an electrical arcing event when Pole Number 7A broke in the wind and

---

[43] Brianna Sacks, *Power lines likely caused Maui's first reported fire, video and data show*, WASHINGTON POST, (Aug. 16, 2023) https://www.washingtonpost.com/climate-environment/2023/08/15/maui-fires-power-line-cause/.

caused the HEI Defendants' energized power lines to fall to the ground and create at least one electrical fault. An electrical arc occurs when an energized power line comes into contact with a foreign object and discharges the electricity from the power line to the foreign object, creating a shower of sparks and often melting a section of the bare copper conductor. This process causes molten metal from the super-heated section of power line to fall into the brush on the ground below, causing a fire. According to Whisker Labs, seven of its sensors in Lahaina recorded two significant faults at 2:44 a.m. and 3:30 a.m. in that same area.[44]

138. The failure of the HEI Defendants' Pole Number 7A likely caused a power outage in the area of Lahainaluna Road and Hoʻokahua Street between approximately 3:00 a.m. and 6:10 a.m. on August 8, 2023. Carly Agbayani, another Lahaina resident who lived in the same area, reported waking up around 5:00 a.m., sweating and realized that her air conditioning was off and that her lights would not turn on. Around 6:00 a.m., she reported that her air conditioning turned on again when power was restored. According to Whisker Lab's sensor data, power in parts of Lahaina came back on briefly between 6:10 a.m. until 6:39 a.m.[45]

139. Despite Pole Number 7A breaking in the wind and damaging the cross-arms of Pole Number E7B around 3:00 a.m., thus, causing a fault, the HEI Defendants recklessly restored power to their power lines along Lahainaluna Road at approximately 6:10 a.m. When Pole number 7A broke and fell to the ground, the resulting force and stress on the power lines strung between Pole Number 7A and Pole Number 25 caused the south phase conductor strung between Pole Numbers 24 and 25 to break and fall to the ground sometime between approximately 3:00 a.m. and 6:37 a.m. when what the HEI Defendants call the Morning Fire first erupted. When the HEI Defendants restored power to this circuit around 6:10 a.m., that restoration of power caused the downed power line to arc on the ground, igniting multiple fires between Pole Numbers 24 and 25. These multiple fires started the Lahaina Fire.

---

[44] *Id.*

[45] *Id.*

140.    Instead of restoring power without investigating, the HEI Defendants should have patrolled the power poles and power lines in the area to determine the cause of the 3:00 a.m. electrical fault before restoring electricity to the downed power line between Pole Numbers 24 and 25.

141.    In fact, the County informed the public that a brush fire was reported at 6:37 a.m. on Lahainaluna Road on August 8, 2023.

142.    Shane Treu, a neighbor of Carly Agbayani on Lahainaluna Road, began live streaming on Facebook around 6:40 a.m. This livestream featured a video of the fire that had just started between Pole Numbers 24 and 25, across the street from his house. On the video, Treu reports, "A power line just went down. See it right there. That's the power line that started it. And we just got our power back on." The video then pans up the street towards Pole Number 25 and Treu then explains, "It started from up the road there. And all of this is still burning." The following screenshot from Mr. Treu's video shows the fire burning across the street from his house and the downed power line between Pole Numbers 24 and 25, and at the base of Pole number 24:



143.    The HEI Defendants have admitted that "[V]ideos show the power lines have fallen to the ground in high winds near the intersection of Lahainaluna Road and Hoʻokahua Street  at approximately 6:30 a.m. A small fire that can be seen by the downed power lines spread into the field across the street from the Intermediate School."[46]

144.    Plaintiffs filed this putative class action on August 12, 2023. On August 17, 2023, Plaintiffs sought a temporary restraining order against the HEI Defendants. Plaintiffs asked the Court to order the HEI Defendants to preserve evidence they had collected and removed from the Area of Origin. The Court heard Plaintiffs' motion the same day they filed it. The next day, the Court issued an Interim Discovery Order, which required the HEI Defendants to preserve any evidence they had collected and removed from the Area of Origin, provide Plaintiffs and their counsel an itemized list of all physical evidence removed, and provide Plaintiffs, their counsel, and their experts access to the physical evidence removed from the Area of  Origin.

145.    Beginning on August 28, 2023, the HEI Defendants provided preliminary access to the Plaintiffs, their counsel and their experts, to view the physical evidence which the HEI Defendants had removed from the Area of Origin. The HEI Defendants also gave notice and provided access to counsel of record and associated experts, in all of the other cases filed against the HEI Defendants arising from the Lahaina Fire. During this inspection, investigators from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and the Maui Fire Department conducted their own inspection of the physical evidence which the HEI Defendants had removed from the Area of Origin, which Plaintiffs' counsel and experts observed.

146.    The following photograph, taken during the August 28, 2023 inspection, depicts broken pieces of the copper south phase conductor which the HEI Defendants' experts reported to have found on the ground between Pole Numbers 24 and 25, adjacent to Lahainaluna Road. The photographed sections of the conductor show evidence of electrical arcing, charring, and

---

[46] Hawaiian Electric, *News Release: Hawaiian Electric provides update on Lahaina fires, response*, *supra*
https://www.hawaiianelectric.com/documents/about_us/news/2023/20230827_lahaina_fires_update.pdf

melting, all of which are consistent with an electrical arcing event that happens when an energized power line falls to the ground:



147.    Many of the HEI Defendants' wooden power poles on Maui are old and beyond their useful life span, in poor condition, and do not meet the National Electric Safety Code requirement to withstand wind speeds of 105 miles per hour. The fires on Maui even immediately *after* the Lahaina Fire show the HEI Defendants' continuing pattern of failures in meeting their duty to maintain, inspect, repair, and replace old and weakened wooden power poles and support equipment before the wooden power poles break and cause wildfires. This "wait until it breaks" approach is a cost-saving practice that entails avoiding necessary preemptive maintenance and repairs to prevent wooden power poles and overhead power lines from failing, breaking, and/or severing during high-wind events. The HEI Defendants' "wait until it breaks" practice continues even after the Lahaina Fire.

148.    On Saturday, August 26, 2023,  a seven-acre wildfire erupted on Old Stuart Road in the hills above Kaʻanapali, forcing the evacuation of residents on Anapuni Loop in Lahaina. This fire broke out when the HEI Defendants' Pole Number 59 broke and fell to the ground, causing energized conductors to ignite surrounding brush. The following photograph depicts the bottom of Pole Number 59, which snapped in high winds:



149.     Another wildfire on Maui occurred recently between Puʻukoliʻi Road and Kakaʻalaneo Drive above Kaʻanapali. This fire started when a guy-wire securing the HEI Defendants' Pole Number 88 broke from its attachment to the wooden power pole. A guy wire is a tensioned cable designed to add stability to a free-standing structure, such as a wooden power pole. When the guy-wire attached to Pole Number 88 fell, it made contact with an energized power line, causing an arcing event. This arcing event ignited the brush below Pole Number 88.

150.     The following photographs depict (1) the HEI Defendants' Pole Number 88 with evidence of charring below the cross-arms and (2) Pole Number 88's broken guy-wire that had been previously attached to the metal fastener located near the top of that pole:

**Pole Number 88:**



**Broken Guy-Wire at Pole Number 88:**



**Broken Guy-Wire at Pole Number 88 (Con't):**



151.    The HEI Defendants' "wait until it breaks" practice caused and contributed to the Lahaina Fire, caused and contributed to subsequent fires on Maui, and will continue to cause and contribute to fires in the future if not enjoined.

## CLASS ACTION ALLEGATIONS

*Class Definitions*

152.    Pursuant to HRCP Rule 23, Plaintiffs bring this action on behalf of themselves and as representatives of all others who are similarly situated. Plaintiffs seek to certify and

maintain this matter as a class action pursuant to HRCP 23(b)(1), (b)(2), and (b)(3) on behalf of a Liability Class, Economic Loss, and Property Damage Subclass ("Economic Loss Subclass"), and Personal Injury and Wrongful Death Subclass ("Personal Injury Subclass").

153.   Plaintiffs anticipate seeking certification of a Liability Class pursuant to HRCP 23(b)(1), (b)(2), and (b)(3) on the global issue of the cause and origin of the Lahaina Fire. Following certification of a Liability Class, Plaintiffs will seek certification of two Subclasses: an Economic Loss Subclass and a Personal Injury Subclass.

154.   Plaintiffs will seek certification of a **Liability Class**, defined as follows:

> All persons and entities who suffered (1) real property loss, (2) personal property loss, (3) business loss, and/or (4) personal injury as a result of the Lahaina Fire that started on August 8, 2023.

155.   Plaintiffs will seek certification of an **Economic Loss and Property Damage Subclass**, defined as follows:

> All persons who suffered economic loss and property damage, including loss or damage to real and personal property and business losses, as a result of the Lahaina Fire that started on August 8, 2023.

156.   Plaintiffs will seek certification of a **Personal Injury and Wrongful Death Subclass**, defined as follows:

> All persons who suffered personal injuries as a result of the Lahaina Fire that started on August 8, 2023, and the personal representatives, survivors, and beneficiaries of the estates of all persons killed as a result of the Lahaina Fire.

157.   Excluded from the class are Defendants, any entity in which Defendants have a controlling interest or that has a controlling interest in (or is under common control with) Defendants, and Defendants' legal representatives, assignees, and successors. Also excluded are the judge to whom this case is assigned and any member of the judge's immediate family.

158.   Tragically, the Lahaina Fire is a rare, single-cause catastrophe that requires swift and decisive action and resolution. Certification of the Liability Class, Economic Loss Subclass,

and Personal Injury Subclass is the only efficient and productive vehicle for the Court and litigants to triage and manage resolution for victims who instantly lost loved ones; who suffered debilitating physical injuries; who were displaced from their homes, schools, employment, and livelihoods; and who will continue to be displaced from their homes, schools, employment, and livelihoods for months and years to come.

159.    The Liability Class, Economic Loss Subclass, and Personal Injury Subclass Plaintiffs will seek to certify are modeled after the classes eventually certified by Honorable Michael A. Hanzman, the now retired Florida Circuit Court Judge who presided over *In Re: Champlain Towers South Collapse Litigation*, Florida Circuit Court, Eleventh Judicial Circuit Miami-Dade County, Florida Case No. 2021-015089-CA-01. The Champlain Towers South collapse was a similarly rare, single-cause catastrophe that instantly killed 98 condominium occupants and ultimately levelled a two-tower coastal condominium building. Through Judge Hanzman's strong leadership, immediate consolidation of victims and their claims, and tireless dedication to swift resolution for victims who lost loved ones and who were displaced from their homes and livelihoods, the vast majority of the nearly $1.2 billion in settlement funds were memorialized in settlement agreements and term sheets by the one-year anniversary of the collapse.

160.    Tragedies with the same scale of devastation as the Lahaina Fire and Champlain Towers South collapse are rare. Thankfully, however, a case like *In Re: Champlain Towers South Collapse Litigation* gives everyone a model to follow for swift justice and recovery. On the other hand, if the Liability Class, Economic Loss Subclass, and Personal Injury Subclass are not certified, the resulting individual litigation quagmire will only prolong and amplify the devastation for hundreds, if not thousands, of Lahaina Fire victims and result in inconsistent outcomes. The Class and Subclass are so numerous that joinder of all members is impracticable, satisfying numerosity. The proposed Liability Class consists of thousands of putative members who have suffered economic losses, personal injuries, or both. Moreover, thousands of putative class members comprise the proposed Economic Loss Subclass and Personal Injury Subclass.

161.     Numerous questions of fact and law common to Plaintiffs and Class and Subclass Members exist, satisfying commonality. These common questions include, but are not limited to, the following:

a.     Whether the Lahaina Fire damaged or destroyed homes, businesses, real property, and personal property;

b.     Whether the Lahaina Fire resulted in personal injuries and death;

c.     Whether the HEI Defendants owed a duty to design, construct, inspect, repair, and maintain their power poles, power lines, transformers, reclosers, and other electrical equipment adequately;

d.     Whether the HEI Defendants owed a duty to maintain, operate, and inspect their power poles, power lines, overhead electrical infrastructure, and equipment properly to ensure they would not cause a fire;

e.     Whether the HEI Defendants owed a duty to deenergize their power lines during a Red Flag Warning to prevent fires;

f.     Whether the HEI Defendants owed a duty to deenergize their power lines during a High Wind Watch to prevent fires;

g.     Whether the HEI Defendants owed a duty to deenergize their power lines during a high fire danger warning;

h.     Whether the HEI Defendants owed a duty to conduct adequate vegetation management, such as clearing vegetation, trees, and tree limbs that could come into contact with their power lines and equipment;

i.     Whether the HEI Defendants owed a duty to deenergize their power lines after the HEI Defendants had knowledge that some power lines had fallen or otherwise come into contact with vegetation, structures, and objects;

j.     Whether the HEI Defendants owed a duty to deenergize their power lines after HEI Defendants' overhead electrical infrastructure had ignited fires;

k.     Whether the HEI Defendants owed a duty to implement reasonable policies, procedures, and equipment that would avoid igniting or spreading fire;

l.     Whether the HEI Defendants owed a duty to adjust their operations despite warnings about fire weather conditions that could result in downed power lines and cause rapid and dangerous fire growth and spread on and after August 8, 2023; and to prevent the downing of power lines, which blocked evacuation routes during the Lahaina Fire;

m.     Whether the power line infrastructure the HEI Defendants owned, operated, controlled, and/or managed caused the Lahaina Fire on August 8, 2023;

n.     Whether the HEI Defendants were negligent in their construction, maintenance, inspection, and operation of overhead electrical infrastructure;

o.     Whether the HEI Defendants were negligent in failing to use reasonable care in maintaining power lines, including thinning, and removing fuels in and around power lines;

p.     Whether the HEI Defendants' decision to not deenergize their power lines before or during the Lahaina Fire was negligent;

q.     Whether the HEI Defendants' decision to not deenergize their power lines before or during the Lahaina Fire was grossly negligent;

r.     Whether the HEI Defendants' decision to restore power near Pole Numbers 7A and E7B, without first determining the cause of the 3:00 a.m. electrical fault in that area, was negligent;

s.     Whether the HEI Defendants' decision to restore power near Pole Numbers 7A and E7B, without first determining the cause of the 3:00 a.m. electrical fault in that area, was grossly negligent.

t.     Whether the HEI Defendants' failure to replace their old wooden power poles was negligent;

u.      Whether the HEI Defendants' failure to replace their old wooden power poles was grossly negligent;

v.      Whether the HEI Defendants' action and/or inaction gives rise to gross negligence and/or was reckless;

w.      Whether the HEI Defendants' decision to not deenergize their power lines caused a private nuisance;

x.      Whether the HEI Defendants are liable under the doctrine of inverse condemnation;

y.      Whether the HEI Defendants considered the elevated risk of fire in West Maui on or around August 8, 2023, in deciding to not deenergize their power lines;

z.      Whether the HEI Defendants have interfered with, or continue to interfere with, Plaintiffs', Class Members', and Subclass Members' use and enjoyment of their lives and property, and whether that interference was or is objectively substantial and unreasonable;

aa.     Whether the HEI Defendants have taken or have damaged property belonging to Plaintiffs, Class Members, and Subclass Members;

bb.     Whether the HEI Defendants have provided just compensation for having taken or having damaged the property belonging to Plaintiffs, Class Members, and Subclass Members;

cc.     Whether the HEI Defendants are strictly liable for an ultrahazardous activity;

dd.     Whether the Telecommunications Defendants owed a duty to design, construct, use, inspect, repair, and maintain their communications equipment attached to the HEI Defendants' power poles properly to ensure they would not cause those power poles to become overloaded and break, fall, or otherwise fail during a high-wind event;

ee.      Whether the Telecommunications Defendants owed a duty to design, construct, use, inspect, repair, and maintain their communications equipment attached to the HEI Defendants' power poles properly to ensure they would not cause a fire;

ff.      Whether the Telecommunications Defendants' telecommunications equipment the Telecommunications Defendants owned, operated, controlled, and/or managed caused the Lahaina Fire on August 8, 2023;

gg.      Whether the Private Landowner Defendants have interfered with, or continue to interfere with, Plaintiffs', Class Members', and Subclass Members' use and enjoyment of their lives and property, and whether that interference was or is objectively substantial and unreasonable;

hh.      Whether the Private Landowner Defendants owed a duty to perform adequate vegetation management on their land in and/or adjacent to Lahaina and its evacuation routes, to avoid the dangerous ignition and spread of a wildfire to other properties and Lahaina's evacuation routes;

ii.      Whether the Private Landowner Defendants owed a duty to construct fire breaks on their land to help control and prevent the dangerous spread of a wildfire on their land in and/or adjacent to Lahaina and its evacuation routes;

jj.      Whether the Private Landowner Defendants owed a duty to effectuate fuel reduction of the highly flammable, nonnative and invasive grasses growing on the land they own, manage, administer, or exercise control over and that is in and/or adjacent to Lahaina and its evacuation routes;

kk.      Whether the Private Landowner Defendants owed a duty to perform fuel conversion on the land they own, manage, administer, or exercise control over and that was in and/or adjacent to Lahaina and its evacuation routes, by replacing invasive, nonnative, highly flammable, and fire-promoting grasses with less flammable ground cover;

ll.      Whether the State Landowner Defendants owed a duty to perform adequate vegetation management on their land in and/or adjacent to Lahaina and its evacuation routes, to avoid the dangerous ignition and spread of a wildfire to other properties and Lahaina's evacuation routes;

mm.      Whether the State Landowner Defendants owed a duty to construct fire breaks on their land to help control and prevent the dangerous spread of a wildfire on their land in and/or adjacent to Lahaina and its evacuation routes;

nn.      Whether the State Landowner Defendants owed a duty to effectuate fuel reduction of the highly flammable, nonnative and invasive grasses growing on the land they own, manage, administer, or exercise control over and that is in and/or adjacent to Lahaina and its evacuation routes;

oo.      Whether the State Landowner Defendants manage, administer, or exercise control over land that was in and/or adjacent to Lahaina and its evacuation routes, by replacing invasive, nonnative, highly flammable, and fire-promoting grasses with less flammable ground cover;

pp.      Whether property over which the County Defendant had control caused or exacerbated the Lahaina Fire on August 8, 2023;

qq.      Whether the County Defendant owed a duty to have adequate emergency response procedures and protocols in place to respond to fires;

rr.      Whether the County Defendant owed a duty to warn residents of impending fire disaster through communications including, but not limited to, sounding the All-Hazard emergency Sirens;

ss.      Whether the County Defendant owed a duty to conduct adequate vegetation management, including, but not limited to, clearing vegetation, trees, abandoned fields, and other property with excessive, highly-flammable vegetation throughout the County to reduce the risk of fire and implementing an aggressive plan to eradicate nonnative plants;

tt.      Whether the County Defendant owed a duty to conduct reasonable inspections of power transmission lines and rights of way;

uu.      Whether the County Defendant owed a duty to work with the HEI Defendants on its infrastructure upgrades and fuel reduction in and around its electrical equipment;

vv.      Whether the County Defendant's action and/or inaction gives rise to gross negligence and/or was reckless; and

ww.      Whether Plaintiffs, Class Members, and Subclass Members are entitled to injunctive relief or other equitable relief, and, if so, the methodology for determining such relief.

162.    The individuals and entities in the Class and Subclasses are the putative Class Members. The Plaintiffs are in the putative Class and Subclasses and are putative Class and Subclass Representatives.

163.    Plaintiffs' claims are typical of the claims of all Class Members. Plaintiffs' claims and the Class claims arise out of Defendants' same, common course of conduct and are based on the same legal, equitable, and remedial theories.

164.    Plaintiffs will fairly and adequately protect the interests of the class. Plaintiffs' claims are typical of the claims of all Class Members. Plaintiffs have retained competent and capable attorneys with experience in complex and class action litigation. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the class and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests that are contrary to or that conflict with those of the proposed class.

165.    A class action is the superior method for the fair and efficient adjudication of this controversy. Common questions of law and fact predominate over any individual questions. Class treatment is superior to multiple individual suits or piecemeal litigation because it conserves judicial resources, promotes consistency and efficiency of adjudication, provides a forum for small claimants, and deters illegal activities. Individual members of the class will have

little to no interest in controlling the litigation due to the high costs of individual actions and the expense and difficulty of litigating against sophisticated parties, such as Defendants. There will be no significant difficulty in the management of this case as a class action.

166.    Defendants engaged in a common course of conduct toward Plaintiffs and Class and Subclass Members. The common issues of fact and law arising from this conduct that affect Plaintiffs and Class and Subclass Members predominate over any individual issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy, efficient use of resources, and consistent outcomes across the Class.

167.    This Court is experienced in managing class action litigation and is a desirable forum because Defendants conduct significant business in this County and in Hawaiʻi.

168.    Plaintiffs and the Class and Subclasses have suffered damages and are continuing to suffer damages.

## COUNT I—NEGLIGENCE

### (Against the HEI Defendants, the Telecommunications Defendants,
### and the Private Landowner Defendants)

169.    Plaintiffs restate and incorporate the allegations above as if fully stated herein.

170.    The HEI Defendants owed the public, Plaintiffs, the Class, and the Subclasses the following duties of care:

   a.    To design, construct, inspect, repair, and maintain their power poles, power lines, transformers, reclosers, and other electrical equipment adequately;

   b.    To maintain, operate, and inspect their power lines, overhead electrical infrastructure, and equipment properly to ensure they would not cause a fire;

   c.    To conduct adequate vegetation management, such as clearing vegetation, trees, and tree limbs that could come into contact with their power lines and equipment;

   d.    To deenergize their power lines during a Red Flag Warning to prevent fires;

e.      To deenergize their power lines during a High Wind Watch to prevent fires;

f.      To deenergize their power lines during high fire danger warnings;

g.      To deenergize their power lines after the HEI Defendants had knowledge that some power lines had fallen or otherwise come into contact with vegetation, structures, and objects;

h.      To deenergize their power lines after the HEI Defendants' overhead electrical infrastructure had ignited fires;

i.      To implement reasonable policies, procedures, and equipment that would avoid igniting or spreading fire;

j.      To adjust their operations given warnings about fire weather conditions that could result in downed power lines and cause rapid and dangerous fire growth and spread on and after August 8, 2023;

k.      To prevent the downing of power lines, which blocked evacuation routes during the Lahaina Fire;

l.      To replace their old wooden power poles, which have exceeded their useful life, are in poor condition and fail to meet the National Electric Safety Code; and

m.      To determine the cause of the electrical fault near Pole Numbers 7A and E7B before restoring power to the circuit near that location.

171.    As set forth in the foregoing paragraphs, the HEI Defendants breached each and all of these duties.

172.    The HEI Defendants' breaches were the proximate cause of injuries that Plaintiffs, the Class, and the Subclasses suffered.

173.    The HEI Defendants' breaches of its duties actually caused injuries that Plaintiffs, the Class, and the Subclasses suffered.

174.    As a result of the foregoing, Plaintiffs, the Class, and the Subclasses suffered damages in an amount to be proven at trial.

175.    As set forth above, the HEI Defendants' conduct was intentional, malicious, and in complete disregard to the rights of Plaintiffs, the Class, and the Subclasses, subjecting the HEI Defendants to awards of punitive damages.

176.    The Telecommunications Defendants owed the public, Plaintiffs, the Class, and the Subclasses the following duties of care:

a.    To design, construct, use, inspect, repair, and maintain their communications equipment adequately;

b.    To design, construct, use, inspect, repair, and maintain their communications equipment to ensure they would not be overloaded, break, fall, or otherwise fail during a high-wind event;  and

c.    To design, construct, use, inspect, repair, and maintain their communications equipment to ensure that they would not cause a fire.

177.    As set forth in the foregoing paragraphs, the Telecommunications Defendants breached each and all of these duties.

178.    The Telecommunications Defendants' breaches were the proximate cause of injuries that Plaintiffs, the Class, and the Subclasses suffered.

179.    The Telecommunications Defendants' breaches of its duties actually caused injuries that Plaintiffs, the Class, and the Subclasses suffered.

180.    As a result of the foregoing, Plaintiffs, the Class, and the Subclasses suffered damages in an amount to be proven at trial.

181.    As set forth above, the Telecommunications Defendants' conduct was intentional, malicious, and in complete disregard to the rights of Plaintiffs, the Class, and the Subclasses, subjecting the Telecommunications Defendants to awards of punitive damages.

182.    The Private Landowner Defendants owed the public, Plaintiffs, the Class, and the Subclasses the following duties of care:

a.      To perform adequate vegetation management on their land in and/or adjacent to Lahaina and its evacuation routes to avoid the dangerous ignition and spread of a wildfire to other properties and Lahaina's evacuation routes;

b.      To construct fire breaks on their land to help control and prevent the dangerous spread of a wildfire on their land in and/or adjacent to Lahaina and its evacuation routes;

c.      To effectuate fuel reduction of the highly flammable, nonnative and invasive grasses growing on the land they own, manage, administer, or exercise control over that is in and/or adjacent to Lahaina and its evacuation routes; and

d.      To perform fuel conversion on the land they own, manage, administer, or exercise control over and that is in and/or adjacent to Lahaina and its evacuation routes, by replacing invasive, nonnative, highly flammable, and fire-promoting grasses with less flammable ground cover.

183.   As set forth in the foregoing paragraphs, the Private Landowner Defendants breached each and all of these duties.

184.   The Private Landowner Defendants' breaches were the proximate cause of injuries that Plaintiffs, the Class, and the Subclasses suffered.

185.   The Private Landowner Defendants' breaches of its duties actually caused injuries that Plaintiffs, the Class, and the Subclasses suffered.

186.   As a result of the foregoing, Plaintiffs, the Class, and the Subclasses suffered damages in an amount to be proven at trial.

187.   As set forth above, the Private Landowner Defendants' conduct was intentional, malicious, and in complete disregard to the rights of Plaintiffs, the Class, and the Subclasses, subjecting Defendants to awards of punitive damages.

## COUNT II—GROSS NEGLIGENCE

### (Against All Defendants)

188.    Plaintiffs restate and incorporate the allegations above as if fully stated herein.

189.    The HEI Defendants owed the public, Plaintiffs, the Class, and the Subclasses the following duties of care:

a.    To design, construct, inspect, repair, and maintain their power poles, power lines, transformers, reclosers, and other electrical equipment adequately;

b.    To maintain, operate, and inspect their power lines, overhead electrical infrastructure, and equipment properly to ensure they would not cause a fire;

c.    To conduct adequate vegetation management, such as clearing vegetation, trees, and tree limbs that could come into contact with their power lines and equipment;

d.    To deenergize their power lines during a Red Flag Warning to prevent fires;

e.    To deenergize their power lines during a High Wind Watch to prevent fires;

f.    To deenergize their power lines during high fire danger warnings;

g.    To deenergize their power lines after the HEI Defendants had knowledge that some power lines had fallen or otherwise come into contact with vegetation, structures, and objects;

h.    To deenergize their power lines after the HEI Defendants' overhead electrical infrastructure had ignited fires;

i.    To implement reasonable policies, procedures, and equipment that would avoid igniting or spreading fires;

j.    To adjust their operations given warnings about fire weather conditions that could result in downed power lines and cause rapid and dangerous fire growth and spread on and after August 8, 2023;

k.      To prevent the downing of power lines, which blocked evacuation routes during the Lahaina Fire;

l.      To replace their old wooden power poles, which have exceeded their useful life, are in poor condition and fail to meet the National Electric Safety Code; and

m.      To determine the cause of the electrical fault near Pole Numbers 7A and E7B before restoring power to the circuit near that location.

190.    The HEI Defendants knew of the extreme fire danger that high winds posed to their overhead electrical infrastructure, particularly during Red Flag conditions. These risks included that winds could topple power poles and power lines, causing them to fall to the ground, ignite vegetation, and cause a wildfire that would spread rapidly.

191.    The HEI Defendants' 2019 Press Release indicates their knowledge of the risks of wildfires associated with high winds.

192.    Despite the HEI Defendants' knowledge of these extreme risks, they chose not to deenergize their power lines during the High Wind Watch and Red Flag Warning conditions for Maui before the Lahaina Fire started.

193.    The HEI Defendants also chose not to deenergize their power lines after they knew some poles and lines had fallen and were in contact with the vegetation or the ground.

194.    The HEI Defendants further failed to deenergize their power lines, even after the Lahaina Fire started.

195.    In the face of knowledge of the risk of high winds and wildfires generally, a High Wind Watch, a Red Flag Warning, and specific warnings that high winds could blow down power poles and that fires would spread rapidly, the HEI Defendants did nothing.

196.    The HEI Defendants chose not to take action to prevent the downing of power lines, which blocked evacuation routes during the Lahaina Fire.

197.    The HEI Defendants also failed to replace their old wooden power poles, which risked both fire ignition and the blocking of evacuation routes.

198.    The HEI Defendants acted with indifference to the probable consequences of their acts and omissions.

199.    The HEI Defendants' gross negligence proximately caused the injuries that Plaintiffs, the Class, and the Subclasses suffered.

200.    The HEI Defendants' gross negligence actually caused injuries that Plaintiffs, the Class, and the Subclasses suffered.

201.    As a result of the foregoing, Plaintiffs, the Class, and the Subclasses suffered damages in an amount to be proven at trial.

202.    As set forth above, the HEI Defendants' conduct was intentional, malicious, and in complete disregard to the rights of Plaintiffs, the Class, and the Subclasses, subjecting the HEI Defendants to awards of punitive damages.

203.    The Telecommunications Defendants owed the public, Plaintiffs, the Class, and the Subclasses the following duties of care:

    a.      To design, construct, use, inspect, repair, and maintain their communications equipment adequately;

    b.      To design, construct, use, inspect, repair, and maintain their communications equipment to ensure they would not be overloaded, break, fall, or otherwise fail during a high-wind event; and

    c.      To design, construct, use, inspect, repair, and maintain their communications equipment to ensure that they would not cause a fire.

204.    The Telecommunications Defendants knew, or should have known, that Maui and Lahaina faced high wildfire risk based on common knowledge of wildfire risk on Maui; wildfires that burned on Maui in 2018 and 2019; the 2019 Collaborative Landscape-Level Approach to Reduce Wildfire Hazard Across Hawaii – Maui Report, the 2020 Maui County Hazard Mitigation Plan Update, and the 2021Wildfire Prevention Report.

205.    Despite the Telecommunications Defendants' knowledge of the wildfire risks, they failed to adequately design, construct, inspect, and repair their communications facilities

attached to the HEI Defendants' wooden power poles to prevent those poles from breaking during a high-wind event and causing a fire.

206.    The Telecommunications Defendants acted with indifference to the probable consequences of their acts and omissions.

207.    The Telecommunications Defendants' gross negligence proximately caused the injuries that Plaintiffs, the Class, and the Subclasses suffered.

208.    The Telecommunications Defendants' gross negligence actually caused injuries that Plaintiffs, the Class, and the Subclasses suffered.

209.    As a result of the foregoing, Plaintiffs, the Class, and the Subclasses suffered damages in an amount to be proven at trial.

210.    As set forth above, the Telecommunications Defendants' conduct was intentional, malicious, and in complete disregard to the rights of Plaintiffs, the Class, and the Subclasses, subjecting the Telecommunications Defendants to awards of punitive damages.

211.    The Private Landowner Defendants and State Landowner Defendants owed the public, Plaintiffs, the Class, and the Subclasses the following duties of care:

a.    To perform adequate vegetation management on their land in and/or adjacent to Lahaina and its evacuation routes to avoid the dangerous ignition and spread of a wildfire to other properties and Lahaina's evacuation routes;

b.    To construct fire breaks on their land to help control and prevent the dangerous spread of a wildfire on their land in and/or adjacent to Lahaina and its evacuation routes;

c.    To effectuate fuel reduction of the highly flammable, nonnative and invasive grasses growing on the land they own, manage, administer, or exercise control over and that is in and/or adjacent to Lahaina and its evacuation routes; and

d.    To perform fuel conversion on the land they own, manage, administer, or exercise control over and that is in and/or adjacent to Lahaina and its evacuation routes,

by replacing invasive, nonnative, highly flammable, and fire-promoting grasses with less flammable ground cover.

212.   The Private Landowner Defendants and State Landowner Defendants knew that Maui and Lahaina faced high wildfire risk based on common knowledge of wildfire risk on Maui, as well as their knowledge of brushfires on similar fallow agricultural land on Maui on multiple prior occasions, including as recently as 2018 when fires triggered by Hurricane Lane burned 2,100 acres in the same region they own, develop, and manage their land. The State Landowner Defendants also knew that Maui and Lahaina faced high wildfire risk based on at least the Hawaii Wildfire Management Organization's 2014 wildfire mitigation plan, the 2020 Maui County Hazard Mitigation Plan Update, the 2019 Collaborative Landscape-Level Approach to Reduce Wildfire Hazard Across Hawaii – Maui Report, and the 2021Wildfire Prevention Report.

213.    Despite the Private Landowner Defendants' and State Landowner Defendants' knowledge of these risks , they failed to adequately perform vegetation management on their land in and/or adjacent to Lahaina to prevent the dangerous ignition and spread of the Lahaina Fire.

214.   The Private Landowner Defendants and State Landowner Defendants acted with indifference to the probable consequences of their acts and omissions.

215.   The Private Landowner Defendants' and State Landowner Defendants' gross negligence proximately caused the injuries that Plaintiffs, the Class, and the Subclasses suffered.

216.   The Private Landowner Defendants' and State Landowner Defendants' gross negligence actually caused injuries that Plaintiffs, the Class, and the Subclasses suffered.

217.   As a result of the foregoing, Plaintiffs, the Class, and the Subclasses suffered damages in an amount to be proven at trial.

218.   As set forth above, the Private Landowner Defendants' and State Landowner Defendants' conduct was intentional, malicious, and in complete disregard to the rights of

Plaintiffs, the Class, and the Subclasses, subjecting the Private Landowner Defendants and State Landowner Defendants to awards of punitive damages.

219.    The County Defendant of Maui owed the public, Plaintiffs, the Class, and the Subclasses the following duties of care:

220.    To implement reasonable policies, procedures, and equipment that would avoid igniting or spreading fires;

221.    To maintain proper and adequate emergency response procedures and protocols in place to respond to fires;

222.    To warn residents of impending wildfires through communications, including, but not limited to, sounding the All-Hazard Emergency Sirens;

223.    To conduct adequate vegetation management, including, but not limited to, clearing vegetation, trees, abandoned fields, and other properties with excessive highly-combustible material throughout the County to reduce the risk of fires and/or fire intensity and implementing an aggressive plan to eradicate nonnative plants;

224.    To conduct reasonable inspections of power transmission lines and rights of way; and

225.    To work with the HEI Defendants on fire mitigation measures, such as infrastructure upgrades and fuel reduction in and around its electrical equipment.

226.    The County Defendant knew of the multitude of risk factors present in the County, which all but ensured that a dangerous wildfire would occur absent its intervention. In fact, the County experienced a dangerous, fast-moving wildfire in 2018, issued a report in 2020 highlighting Lahaina as vulnerable to wildfire, and issued a report in 2021 identifying various risks and possible responsive action.

227.    At the very least, the County Defendant knew that Hurricane Lane had ignited fires on Maui in August 2018; that downed power lines may have caused those 2018 fires; that fire hydrants ran dry during those 2018 fires; that the County Defendant had not sounded the Sirens during the 2018 fires; that wildfires were increasing in frequency and severity; that

wildfires posed a risk to citizens, property, and sacred sites; that island communities like those on Maui were particularly vulnerable to wildfires due to dense population and limited evacuation routes; that Hawai'i and, specifically, Maui, faced a more extreme fire risk than the mainland; that most of Maui was in moderate or severe drought; that Maui was particularly vulnerable to fire; and that nonnative plants fuel fires.

228.    The County Defendant knew that Maui and, specifically, Lahaina, faced high wildfire risk based on, at the very least, the Hawaii Wildfire Management Organization's 2014 wildfire mitigation plan, the 2020 Maui County Hazard Mitigation Plan Update, and the 2021 Wildfire Prevention Report.

229.     Despite the County Defendant's knowledge of these risks, the County Defendant failed to adequately implement the fire prevention and control measures outlined in these various emergency plans.

230.    Further, the County Defendant failed to warn its residents, tourists, and shopkeepers of the Lahaina Fire by, among other things, failing to use the All-Hazard Emergency Sirens, even though the County Defendant published on its website that the Sirens were meant to warn residents about wildfires.

231.    The County Defendant acted with indifference to the probable consequences of their acts and omissions.

232.    The County Defendant's gross negligence proximately caused the injuries that Plaintiffs, the Class, and the Subclasses suffered.

233.    The County Defendant's gross negligence actually caused injuries that Plaintiffs, the Class, and the Subclasses suffered.

234.    As a result of the foregoing, Plaintiffs, the Class, and the Subclasses suffered damages in an amount to be proven at trial.

235.    As set forth above, the County Defendant's conduct was intentional, malicious, and in complete disregard to the rights of Plaintiffs, the Class, and the Subclasses, subjecting the County Defendant to awards of punitive damages.

## COUNT III—PRIVATE NUISANCE

### (Against the HEI Defendants, the Telecommunications Defendants, and the Private Landowner Defendants)

236.    Plaintiffs restate and incorporate the allegations above as if fully stated herein.

237.    Plaintiffs have a possessory interest in their real property, including the right to quiet use and enjoyment of that property.

238.    The HEI Defendants acted unreasonably, negligently, and recklessly in designing, constructing, inspecting, repairing, and maintaining their power poles, power lines, transformers, reclosers, and other electrical equipment inadequately.

239.    The HEI Defendants acted unreasonably, negligently, and recklessly in maintaining, operating, and inspecting their power poles, power lines, overhead electrical infrastructure, and equipment to ensure they would not cause a fire.

240.    The HEI Defendants acted unreasonably, negligently, and recklessly in failing to deenergize their power lines during a Red Flag Warning.

241.    The HEI Defendants acted unreasonably, negligently, and recklessly in failing to deenergize their power lines during a High Wind Watch.

242.    The HEI Defendants acted unreasonably, negligently, and recklessly in failing to deenergize their power lines once they knew that wind had knocked down power poles, putting the power lines in contact with vegetation.

243.    The HEI Defendants acted unreasonably, negligently, and recklessly in failing to deenergize their power lines immediately after the Lahaina Fire started.

244.    The HEI Defendants acted unreasonably, negligently, and recklessly in failing to prevent the downing of power lines, which blocked evacuation routes during the Lahaina Fire.

245.    The HEI Defendants acted unreasonably, negligently, and recklessly in failing to replace their old wooden power poles, which have exceeded their useful life, are in poor condition and fail to meet the National Electric Safety Code.

246.     The HEI Defendants acted unreasonably, negligently, and recklessly in failing to determine the cause of the electrical fault near Pole Numbers 7A and E7B before restoring power to the circuit near that location.

247.     The HEI Defendants' unreasonable, negligent, and reckless acts resulted in an invasion of Plaintiffs', the Class', and the Subclasses' private use and enjoyment of their land.

248.     The gravity of harm from the HEI Defendants' conduct outweighs any utility associated with keeping the power lines energized during a High Wind Watch and Red Flag Warning, once the HEI Defendants' power poles failed, and once the Lahaina Fire started.

249.     The HEI Defendants' 2019 Press Release reflects their knowledge that high winds posed a risk of safety to the public. In addition, HEI Defendants reviewed and studied various Wildfire Mitigation Plans that included PSPS during the very kinds of conditions preceding and during the Lahaina Fire. HEI Defendants also knew, or should have known, about the High Wind Watch and Red Flag Warning.

250.     The HEI Defendants took an unreasonable risk in failing to deenergize their power lines.

251.     The HEI Defendants also took an unreasonable risk in failing to replace their wooden power poles.

252.     The HEI Defendants' many failures resulted in serious harm to Plaintiffs, the Class, and the Subclasses, depriving them of the quiet use and enjoyment of their property.

253.     The HEI Defendants' conduct proximately caused the injuries that Plaintiffs, the Class, and the Subclasses suffered.

254.     The HEI Defendants' conduct actually caused injuries that Plaintiffs, the Class, and the Subclasses suffered.

255.     As a result of the foregoing, Plaintiffs, the Class, and the Subclasses suffered damages in an amount to be proven at trial.

256.    As set forth above, the HEI Defendants' conduct was intentional, malicious, and in complete disregard to the rights of Plaintiffs, the Class, and the Subclasses, subjecting the HEI Defendants to awards of punitive damages.

257.    The Telecommunications Defendants acted unreasonably, negligently, and recklessly in designing, constructing, inspecting, managing, using, and repairing their communications facilities attached to the HEI Defendants' wooden power poles to prevent those poles from breaking during a high-wind event and causing a fire.

258.    The Telecommunications Defendants' unreasonable, negligent, and reckless acts resulted in an invasion of Plaintiffs', the Class', and the Subclasses' private use and enjoyment of their land.

259.    The gravity of harm from the Telecommunications Defendants' failure to act outweighs any possible utility of their conduct, if any such utility exists.

260.    The Telecommunications Defendants knew, or should have known, that Maui and Lahaina faced high wildfire risk based on common knowledge of wildfire risk on Maui; wildfires that burned on Maui in 2018 and 2019; the 2019 Collaborative Landscape-Level Approach to Reduce Wildfire Hazard Across Hawaii – Maui Report, the 2020 Maui County Hazard Mitigation Plan Update, and the 2021Wildfire Prevention Report. The Telecommunications Defendants also knew, or should have known, about the High Wind Watch and Red Flag Warning.

261.    The Telecommunications Defendants took an unreasonable risk in failing to design, construct, inspect, manage, use, and repair adequately their communications facilities attached to the HEI Defendants' wooden power poles to prevent those poles from breaking during a high-wind event and causing a fire.

262.    The Telecommunications Defendants' many failures resulted in serious harm to Plaintiffs, the Class, and the Subclasses, depriving them of the quiet use and enjoyment of their property.

263.    The Telecommunications Defendants' conduct proximately caused the injuries that Plaintiffs, the Class, and the Subclasses suffered.

264.    The Telecommunications Defendants' conduct actually caused injuries that Plaintiffs, the Class, and the Subclasses suffered.

265.    As a result of the foregoing, Plaintiffs, the Class, and the Subclasses suffered damages in an amount to be proven at trial.

266.    As set forth above, the Telecommunications Defendants' conduct was intentional, malicious, and in complete disregard to the rights of Plaintiffs, the Class, and the Subclasses, subjecting the Telecommunications Defendants to awards of punitive damages.

267.    The Private Landowner Defendants acted unreasonably, negligently, and recklessly in failing to perform adequate vegetation management on their land in and/or adjacent to Lahaina and its evacuation routes to avoid the dangerous ignition and spread of a wildfire to other properties and Lahaina's evacuation routes.

268.    The Private Landowner Defendants acted unreasonably, negligently, and recklessly in failing to construct fire breaks on their land to help control and prevent the dangerous spread of a wildfire on their land in and/or adjacent to Lahaina and its evacuation routes.

269.    The Private Landowner Defendants acted unreasonably, negligently, and recklessly in failing to effectuate fuel reduction of the highly flammable, nonnative and invasive grasses growing on the land they own, manage, administer, or exercise control over and that is in and/or adjacent to Lahaina and its evacuation routes.

270.    The Private Landowner Defendants acted unreasonably, negligently, and recklessly in failing to perform fuel conversion on the land they own, manage, administer, or exercise control over and that is in and/or adjacent to Lahaina and its evacuation routes, by replacing invasive, nonnative, highly flammable, and fire-promoting grasses with less flammable ground cover.

71

271.   The Private Landowner Defendants' unreasonable, negligent, and reckless acts resulted in an invasion of Plaintiffs', the Class', and the Subclasses' private use and enjoyment of their land.

272.   The gravity of harm from the Private Landowner Defendants' failure to act outweighs any possible utility of their conduct, if any such utility exists.

273.   The Private Landowner Defendants knew that Maui and, specifically, Lahaina, faced high wildfire risk based on common knowledge of wildfire risk on Maui, as well as their knowledge of brushfires on similar fallow agricultural land on Maui on multiple prior occasions, including as recently as 2018 when Hurricane Lane triggered fires that burned 2,100 acres in the same region where they own, develop, and manage their land.

274.   The Private Landowner Defendants took an unreasonable risk in failing to perform adequate vegetation management on their land in and/or adjacent to Lahaina and its evacuation routes to avoid the dangerous ignition and spread of a wildfire to other properties and Lahaina's evacuation routes.

275.   The Private Landowner Defendants took an unreasonable risk in failing to construct fire breaks on their land to help control and prevent the dangerous spread of a wildfire on their land in and/or adjacent to Lahaina and its evacuation routes.

276.   The Private Landowner Defendants took an unreasonable risk in failing to effectuate fuel reduction of the highly flammable, nonnative and invasive grasses growing on the land they own, manage, administer, or exercise control over and in and/or adjacent to Lahaina and its evacuation routes.

277.   The Private Landowner Defendants took an unreasonable risk in failing to perform fuel conversion on the land they own, manage, administer, or exercise control over and that is in and/or adjacent to Lahaina and its evacuation routes, by replacing invasive, nonnative, highly flammable, and fire-promoting grasses with less flammable ground cover.

278.    The Private Landowner Defendants' many failures resulted in serious harm to Plaintiffs, the Class, and the Subclasses, depriving them of the quiet use and enjoyment of their property.

279.    The Private Landowner Defendants' conduct proximately caused the injuries that Plaintiffs, the Class, and the Subclasses suffered.

280.    The Private Landowner Defendants' conduct actually caused injuries that Plaintiffs, the Class, and the Subclasses suffered.

281.    As a result of the foregoing, Plaintiffs, the Class, and the Subclasses suffered damages in an amount to be proven at trial.

282.    As set forth above, the Private Landowner Defendants' conduct was intentional, malicious, and in complete disregard to the rights of Plaintiffs, the Class, and the Subclasses, subjecting the Private Landowner Defendants to awards of punitive damages.

## COUNT IV—INVERSE CONDEMNATION

### (Against the HEI Defendants and the Telecommunications Defendants)

283.    Plaintiffs restate and incorporate the allegations above as if fully stated herein.

284.    Plaintiffs, the Class, and the Subclasses are property owners or persons claiming an interest in their property.

285.    The Hawaiʻi Constitution, Article I, Section 20 provides, "Private property shall not be taken or damaged for public use without just compensation."

286.    Pursuant to HRS § 269-1, the HEI Defendants and the Telecommunications Defendants are public utilities.

287.    The HEI Defendants deliberately designed, installed, own, control, operate, manage, use, and/or maintain overhead electrical infrastructure in Hawaiʻi for the purpose of furnishing light, power, and electricity for public use. In fact, The HEI Defendants provide electricity to 95% of Hawaiʻi's residents. Thus, the HEI Defendants operate as a public utility within the meaning of HRS § 269-1(1).

288.    The Telecommunications Defendants own, operate, manage, and/or control any facilities used to furnish telecommunications services for profit to the public and engage in the provision of services such as voice, data, graphics, and video services. The Telecommunications Defendants make use of all or part of their transmission facilities, switches, broadcast equipment, signaling, and/or control devices. The Telecommunications Defendants offer transmission between or among points specified by a user, of information of the user's choosing, including voice, data, image, graphics, and video without change in the form or content of the information, as sent and received, by means of electromagnetic transmission, or other similarly capable means of transmission, with or without benefit of any closed transmission medium. Thus, the Telecommunications Defendants operate as a public utility within the meaning of HRS § 269-1(1).

289.    HRS § 101-4 gives the HEI Defendants and the Telecommunications Defendants "[t]he right and power of eminent domain" as operators of public utilities. Thus, the HEI Defendants and the Telecommunications Defendants have the power of condemnation.

290.    The HEI Defendants' design, construction, use, and/or maintenance of their overhead electrical power poles, power lines and the Telecommunications Defendants' design, construction, use, and/or maintenance of their equipment on the power poles created an inherent risk that their power poles and power lines would fail, break and/or sever during strong wind events, causing energized power lines to fall to the ground and come into contact with combustible vegetation below thereby igniting a wildfire. Further, Plaintiffs are informed and believe that the HEI Defendants neglected to perform preventative maintenance, including but not limited to replacing aging and/or weakened wooden power poles to prevent them from failing during a high-wind event and that the Telecommunications Defendants neglected to perform preventative maintenance, including but not limited to, ensuring that their equipment was not tensioned too tightly and, therefore, did not overburden or overload the wooden power poles.

291.    Plaintiffs are informed and believe that the HEI Defendants adopted a "wait until it breaks" plan of maintaining of their wooden power poles and overhead power lines as a cost-

saving policy instead of performing the necessary preemptive maintenance and repairs to prevent its wooden power poles and overhead power lines from failing, breaking, and/or severing during high-wind events. Plaintiffs are further informed and believe that the Telecommunications Defendants also adopted a "wait until it breaks" plan of maintaining equipment on the HEI Defendants' wooden power poles, also as a cost-saving policy. The Telecommunications Defendants failed to act proactively to manage their equipment appropriately to prevent the overburdening of wooden power poles and, consequently, to protect them from breaking during high-wind events.

292. These inherent risks were the substantial cause of the Plaintiffs', the Class', and the Subclasses' real and personal property damages, personal injuries, and wrongful deaths. These damages were the necessary or probable result of the HEI Defendants' and the Telecommunications Defendants' overhead electrical infrastructure and telecommunications equipment and/or the immediate, direct, and necessary effect of their electrical infrastructure and telecommunications equipment. Plaintiffs are informed and believe that wooden power poles within the Area of Origin failed, broke, and snapped during high winds on August 8, 2023, which caused energized power lines to fall to the ground and ignite combustible vegetation below. The resulting Lahaina Fire was the inescapable and/or avoidable consequence of the HEI Defendants' and the Telecommunications Defendants' public improvement as planned, constructed, and maintained by them. The HEI Defendants and the Telecommunications Defendants also interfered, and substantially interfered, with the use, access, enjoyment, value, and marketability of the Plaintiffs', the Class's, and the Subclasses' property.

293. Thus, the HEI Defendants and the Telecommunications Defendants have taken private property from Plaintiffs, the Class, and the Subclasses without adequate or just compensation.

294. The damage to Plaintiffs, the Class, and the Subclasses was the necessary, certain, predictable, and/or inevitable result of the HEI Defendants' and the Telecommunications Defendants' actions.

295.    The damage to Plaintiffs, the Class, and the Subclasses outweighs the risk and harm from the improvements the HEI Defendants and the Telecommunications Defendants undertook to provide electricity to the public.

296.    Justice, fairness, and the Hawai'i Constitution require that the HEI Defendants and the Telecommunications Defendants compensate Plaintiffs, the Class, and the Subclasses for the taking of their property and their injuries.

297.    As a result of the foregoing, Plaintiffs, the Class, and the Subclasses suffered damages in an amount to be proven at trial.

298.    As set forth above, the HEI Defendants' and the Telecommunications Defendants' conduct was intentional, malicious, and in complete disregard to the rights of Plaintiffs, the Class, and the Subclasses, subjecting the HEI Defendants and the Telecommunications Defendants to awards of punitive damages.

## COUNT V—ULTRAHAZARDOUS ACTIVITY
### (Against the HEI Defendants)

299.    Plaintiffs restate and incorporate the allegations above as if fully stated herein.

300.    The HEI Defendants carried on an abnormally dangerous activity by maintaining power in their power lines during a High Wind Watch and Red Flag Warning that specifically cautioned that high winds could topple power poles and that any fire that started would likely spread rapidly.

301.    Thus, the HEI Defendants owed a heightened duty of care to the public, Plaintiffs, the Class, and the Subclasses. This heightened duty required the HEI Defendants to exercise the highest possible degree of skill, care, caution, diligence, and foresight in maintaining power in their power lines during a High Wind Watch and Red Flag Warning.

302.    Maintaining power in their power lines during a High Wind Watch and Red Flag Warning, during which the NWS warned that power poles were at risk of being blown over by

strong winds and in which any fire that started would spread rapidly, is an abnormally dangerous activity, subjecting the HEI Defendants to strict liability.

303.    The risk of harm to the public, Plaintiffs, the Class, and the Subclasses was high, given the high winds and drought conditions.

304.    The likelihood that maintaining power to the power lines during a High Wind Watch and Red Flag Warning would result in power lines blowing over and putting live power lines in contact with vegetation was high.

305.    The HEI Defendants could not eliminate the risk associated with maintaining power to their power lines during a High Wind Watch or Red Flag Warning and also engage in this abnormally dangerous activity.

306.    The practice of deenergizing power lines during fire weather conditions is commonplace in the Western United States. The HEI Defendants maintained power in their overhead electrical infrastructure during a High Wind Watch and Red Flag Warning in a manner outside common usage.

307.    Maintaining power in their overhead electrical infrastructure during a High Wind Watch and Red Flag Warning was inappropriate on Maui, given the drought conditions and high fire risk weather forecast.

308.    Nothing about maintaining the power in the HEI Defendants' power lines outweighs the dangerous risk of keeping the electrical infrastructure energized, given the High Wind Watch and Red Flag Warning.

309.    As set forth above, the HEI Defendants' conduct was intentional, malicious, and in complete disregard to the rights of Plaintiffs, the Class, and the Subclasses, subjecting the HEI Defendants to awards of punitive damages.

## COUNT VI—INJUNCTIVE RELIEF

### (Against All Defendants)

310.    Plaintiffs restate and incorporate the allegations above as if fully stated herein.

311.    Plaintiffs seek an order enjoining the HEI Defendants from leaving their power lines energized in high fire risk areas of Maui during Red Flag Warning and/or High Wind Warning conditions.

312.    Plaintiffs seek an order requiring the HEI Defendants to use tools and technologies to mitigate the risk of fire, including but not limited to, repairing and replacing wooden power poles so that they comply with the National Electric Safety Code requirements to withstand wind speeds of 105 miles per hour, burying transmission lines, using covered conductors and non-expulsion fuses, and/or disabling automatic reclosers during fire weather conditions.

313.    Plaintiffs seek an order requiring the Telecommunications Defendants to properly design, construct, and attach their communications facilities to wooden power poles to prevent the poles from breaking during a high-wind event and causing a wildfire.

314.    Plaintiffs seek an order requiring the Private Landowner Defendants and the State Landowner Defendants to properly perform vegetation management on the land they own, manage, administer, develop, and/or exercise control over to prevent the dangerous ignition and/or spread of a wildfire.

315.    Plaintiffs seek an order requiring the Private Landowner Defendants and the State Landowner Defendants to properly create firebreaks on the land they own, manage, administer, develop and/or and exercise control over to prevent the dangerous spread of a wildfire.

316.    Plaintiffs seek an order requiring the County Defendant to use its Sirens to warn the public of a wildfire.

**WHEREFORE**, Plaintiffs, the Class, and Subclasses pray for judgment and relief as follows:

1.    Confirmation that this lawsuit is properly maintainable as a class action;

2.    Certification of the Class and Subclasses;

3.    Appointment of certain named Plaintiffs as Class Representatives;

4.    Appointment of Class Counsel;

5.      Damages according to proof;

6.      Diminution in value according to proof;

7.      Injunctive relief;

8.      Punitive damages;

9.      Prejudgment and post judgment interest;

10.     Attorney fees and costs; and

11.     Such other and further relief the Court may deem just and proper.


DATED:  Los Angeles, California, October 13, 2023.


                    */s/ Graham B. LippSmith*
                    GRAHAM B. LIPPSMITH
                    MARYBETH LIPPSMITH
                    JACLYN L. ANDERSON
                    CELENE CHAN ANDREWS
                    ROBERT A. CURTIS
                    KEVIN D. GAMARNIK
                    LUIS A. SAENZ
                    ALEXANDER ROBERTSON, IV

                    Attorneys for Plaintiffs, Individually, and in Their
                    Representative Capacities and on Behalf of a Class and the
                    Subclasses of All Persons Similarly Situated

# EXHIBIT A



**Hawaiian Electric**
**Maui Electric**
**Hawaiʻi Electric Light**

N E W S   R E L E A S E

**FOR IMMEDIATE RELEASE**

# Hawaiian Electric Companies to conduct drone surveys as part of overall wildfire mitigation planning
*Flights scheduled in East Oʻahu, West Maui to pinpoint vulnerable areas*

**HONOLULU, Nov. 5, 2019** – The Hawaiian Electric Companies will conduct drone surveys across their five-island territory to identify areas vulnerable to wildfire and determine the best course of action to protect the public, as well as electrical infrastructure.

Drone, or unmanned aircraft system, surveys will be conducted in November and December in East Oʻahu, West Maui and Maʻalaea. Future surveys are being planned for Kaʻū on Hawaiʻi Island.

These aerial inspections are part of the companies' proactive assessment and management of vegetation near their electrical infrastructure, especially in drought-prone or dry brush areas.

Hawaiian Electric, Maui Electric and Hawaiʻi Electric Light earlier this year evaluated the wildfire mitigation plans filed by the major utilities in California and studied Hawaiʻi fire ignition maps to determine where the greatest risks are and to provide a basis for planning.

Unlike California, many utility lines in Hawaiʻi run through tropical forests and areas that typically receive abundant rainfall. That makes it easier to concentrate on mapping drought-prone areas where sparks could ignite dry grass and brush beneath power lines.

Other resilience initiatives launched by the companies to prevent wildfires include:

- Installing heavier, insulated conductors on Maui and Oʻahu to stop lines from slapping and sparking in areas prone to high winds. The companies are identifying more areas where it makes sense to install these conductors.
- Installing smart switches and smart fuses to minimize sparks created when lines come into contact with each other, and with vegetation.
- Applying fire retardants on poles identified in fire hazard areas. Last month, Hawaiian Electric tested several different fire retardants on wooden poles in a controlled burn to determine which products will best protect the companies' infrastructure.
- Looking into using weather sensors, cameras and thermal imagers to give more precise locations on localized wind gusts, relative humidity and temperatures.

**# # #**

FOLLOW US FOR THE LATEST:
       

**IN THE CIRCUIT COURT OF THE FIRST CIRCUIT**

**STATE OF HAWAI'I**

| | |
|---|---|
| MONICA I. EDER; REDE S. EDER; BRUCE BAUM; SHERYL LYNN MARTIN; PATRICE CARLTON; MONA CHERRY; CLUB SPORTWEAR, INC. dba KAIALOHA SUPPLY; TERESA COLEMAN; LINDA BETHELL DONOVAN TRUST;  LINDA BETHELL DONOVAN; CANDICE FAUST; PETER FAUST; KAILI FAUST; DAVID HEYMES; TOMMY KNAPP; KRONSER TRUST; PAUL KRONSER; KRISTI LYNN KRONSER; JENNIFER LYNN MCNAMEE; RANDALL EUGENE MCNAMEE; CHARLENE MEDEIROS; CHARLOTTE MEDEIROS; ERIC MCCUMBER; JONATHAN MELIKIDSE; CHRISTY MELIKIDSE; ROSE O'LEARY; STEVEN DAVID POTTER; TIMOTHY PUTNAM; LORRI ROBUSTO; WILLIAM ROBUSTO; KATHRYN SAY; AYDIN SAY; STARDUST HAWAI'I dba SEGWAY MAUI; MARTY STEVENSON; CONSTANCE STEVENSON; KAORU TANABE; ROLLAND WILLIAMS, JR.; and JENNIFER WISEMAN, Individually and in Their Representative Capacities and on Behalf of a Class and Subclasses of All Persons Similarly Situated, | CIVIL NO. 1CCV-23-0001045 JPC (Property Damage/Personal Injury) **DEMAND FOR JURY TRIAL** |
| Plaintiffs, | |
| vs. | |
| MAUI ELECTRIC COMPANY, LIMITED; HAWAIIAN ELECTRIC COMPANY, INC.; HAWAII ELECTRIC LIGHT COMPANY, INC.; HAWAIIAN ELECTRIC INDUSTRIES, INC.; COUNTY OF MAUI; HAWAIIAN TELCOM; HAWAIIAN TELECOMMUNICATIONS, INC.; HAWAIIAN TELCOM, INC.; SPECTRUM OCEANIC, LLC; CHARTER COMMUNICATIONS HOLDING COMPANY, LLC; CHARTER COMMUNICATIONS HOLDING, LLC; CHARTER COMMUNICATIONS, LLC; CHARTER COMMUNICATIONS OPERATING, LLC; | |

TRUSTEES OF THE ESTATE OF BERNICE
PAUAHI BISHOP; PETER KLINT MARTIN;
PETER KLINT MARTIN REVOCABLE TRUST;
HOPE BUILDERS HOLDING LLC; HOPE
BUILDERS INC.; HOPE BUILDERS LLC;
KAUAULA LAND COMPANY LLC; KIPA
CENTENNIAL, LLC; DOUGLAS POSELEY;
DONNA ANNE POSELEY; JAMES C. RILEY
TRUST; JEANNE A. RILEY TRUST; WAINEE
LAND & HOMES, LLC; WEST MAUI LAND
COMPANY, INC.; MAKILA RANCHES INC.;
MAKILA LAND CO., LLC; MAKILA RANCHES
HOMEOWNERS ASSOCIATION, INC.; JV
ENTERPRISES, LLC; STATE OF HAWAIʻI;
HAWAII HOUSING FINANCE AND
DEVELOPMENT CORPORATION; HAWAIʻI
DEPARTMENT OF LAND AND NATURAL
RESOURCES; DOE POWER UTILITIES, 1–10;
DOE TELECOMMUNICATIONS, 1–10; DOE
PRIVATE LANDOWNERS, 1–10; and DOE
STATE LANDOWNERS, 1–10,

       Defendants.

## DEMAND FOR JURY TRIAL

Plaintiffs, individually and in their representative capacities and on behalf of a Class and Subclasses of all persons similarly situated, hereby demand trial by jury on all issues so triable herein.

DATED:  Los Angeles, California, October 13, 2023.

                    */s/ Graham B. LippSmith*
                    GRAHAM B. LIPPSMITH
                    MARYBETH LIPPSMITH
                    JACLYN L. ANDERSON
                    CELENE CHAN ANDREWS
                    ROBERT A. CURTIS
                    KEVIN D. GAMARNIK
                    LUIS A. SAENZ
                    ALEXANDER ROBERTSON, IV

Attorneys for Plaintiffs, Individually, and in Their
Representative Capacities and on Behalf of a Class and the
Subclasses of All Persons Similarly Situated

| **STATE OF HAWAI'I**<br>**CIRCUIT COURT OF THE**<br>**FIRST CIRCUIT** | **SUMMONS**<br>TO ANSWER SECOND<br>AMENDED CIVIL COMPLAINT | **CASE NUMBER**<br>1CCV-23-0001045 JPC |
|---|---|---|

| PLAINTIFF | VS. | DEFENDANT(S) |
|---|---|---|

PLAINTIFF
MONICA I. EDER; REDE S. EDER; BRUCE BAUM; SHERYL LYNN MARTIN; PATRICE CARLTON; MONA CHERRY; CLUB SPORTWEAR, INC. dba KAIALOHA SUPPLY; TERESA COLEMAN; LINDA BETHELL DONOVAN TRUST;  LINDA BETHELL DONOVAN; CANDICE FAUST; PETER FAUST; KAILI FAUST; DAVID HEYMES; TOMMY KNAPP; KRONSER TRUST; PAUL KRONSER; KRISTI LYNN KRONSER; JENNIFER LYNN MCNAMEE; RANDALL EUGENE MCNAMEE; CHARLENE MEDEIROS; CHARLOTTE MEDEIROS; ERIC MCCUMBER; JONATHAN MELIKIDSE; CHRISTY MELIKIDSE; ROSE O'LEARY; STEVEN DAVID POTTER; TIMOTHY PUTNAM; LORRI ROBUSTO; WILLIAM ROBUSTO; KATHRYN SAY; AYDIN SAY; STARDUST HAWAI'I dba SEGWAY MAUI; MARTY STEVENSON; CONSTANCE STEVENSON; KAORU TANABE; ROLLAND WILLIAMS, JR.; and JENNIFER WISEMAN, Individually and in Their Representative Capacities and on Behalf of a Class and Subclasses of All Persons Similarly Situated

DEFENDANT(S) MAUI ELECTRIC COMPANY, LIMITED; HAWAIIAN ELECTRIC COMPANY, INC.; HAWAII ELECTRIC LIGHT COMPANY, INC.; HAWAIIAN ELECTRIC INDUSTRIES, INC.; COUNTY OF MAUI; HAWAIIAN TELCOM; HAWAIIAN TELECOMMUNICATIONS, INC.; HAWAIIAN TELCOM, INC.; SPECTRUM OCEANIC, LLC; CHARTER COMMUNICATIONS HOLDING COMPANY, LLC; CHARTER COMMUNICATIONS HOLDING, LLC; CHARTER COMMUNICATIONS, LLC; CHARTER COMMUNICATIONS OPERATING, LLC; TRUSTEES OF THE ESTATE OF BERNICE PAUAHI BISHOP; PETER KLINT MARTIN; PETER KLINT MARTIN REVOCABLE TRUST; HOPE BUILDERS HOLDING LLC; HOPE BUILDERS INC.; HOPE BUILDERS LLC; KAUAULA LAND COMPANY LLC; KIPA CENTENNIAL, LLC; DOUGLAS POSELEY; DONNA ANNE POSELEY; JAMES C. RILEY TRUST; JEANNE A. RILEY TRUST; WAINEE LAND & HOMES, LLC; WEST MAUI LAND COMPANY, INC.; MAKILA RANCHES INC.; MAKILA LAND CO., LLC; MAKILA RANCHES HOMEOWNERS ASSOCIATION, INC.; JV ENTERPRISES, LLC; STATE OF HAWAI'I; HAWAII HOUSING FINANCE AND DEVELOPMENT CORPORATION; HAWAI'I DEPARTMENT OF LAND AND NATURAL RESOURCES; DOE POWER UTILITIES, 1–10; DOE TELECOMMUNICATIONS, 1–10; DOE PRIVATE LANDOWNERS, 1–10; and DOE STATE LANDOWNERS, 1–10

PLAINTIFF'S NAME & ADDRESS, TEL. NO.
GRAHAM B. LIPPSMITH 9593, g@lippsmith.com
MARYBETH LIPPSMITH 11578, mb@lippsmith.com
JACLYN L. ANDERSON 11075, jla@lippsmith.com
CELENE CHAN ANDREWS 9902, cca@lippsmith.com
LIPPSMITH LLP
55 Merchant Street, Suite 1850
Honolulu, Hawai'i 96813
Tel: (213) 344-1820

**TO THE ABOVE-NAMED DEFENDANT(S)**

You are hereby summoned and required to file with the court and serve upon

LIPPSMITH LLP
55 Merchant Street, Suite 1850
Honolulu, Hawai'i 96813

plaintiff's attorney, whose address is stated above, an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the date of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

**THIS SUMMONS SHALL NOT BE PERSONALLY DELIVERED BETWEEN 10:00 P.M. AND 6:00 A.M. ON PREMISES NOT OPEN TO THE GENERAL PUBLIC, UNLESS A JUDGE OF THE ABOVE-ENTITLED COURT PERMITS, IN WRITING ON THIS SUMMONS, PERSONAL DELIVERY DURING THOSE HOURS.**

**A FAILURE TO OBEY THIS SUMMONS MAY RESULT IN AN ENTRY OF DEFAULT AND DEFAULT JUDGMENT AGAINST THE DISOBEYING PERSON OR PARTY.**

The original document is filed in the Judiciary's electronic case management system which is accessible via eCourt Kokua at: http://www.courts.state.hi.us

**Effective Date of 28-Oct-2019**
**Signed by: /s/ Patsy Nakamoto**
**Clerk, 1st Circuit, State of Hawai'i**





In accordance with the Americans with Disabilities Act, and other applicable state and federal laws, if you require a reasonable accommodation for a disability, please contact the ADA Coordinator at the Circuit Court Administration Office on OAHU- Phone No. 808-539-4400, TTY 808-539-4853, FAX 539-4402, at least ten (10) working days prior to your hearing or appointment date.

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI'I

| | |
|---|---|
| MONICA I. EDER; REDE S. EDER; BRUCE BAUM; SHERYL LYNN MARTIN; PATRICE CARLTON; MONA CHERRY; CLUB SPORTWEAR, INC. dba KAIALOHA SUPPLY; TERESA COLEMAN; LINDA BETHELL DONOVAN TRUST;  LINDA BETHELL DONOVAN; CANDICE FAUST; PETER FAUST; KAILI FAUST; DAVID HEYMES; TOMMY KNAPP; KRONSER TRUST; PAUL KRONSER; KRISTI LYNN KRONSER; JENNIFER LYNN MCNAMEE; RANDALL EUGENE MCNAMEE; CHARLENE MEDEIROS; CHARLOTTE MEDEIROS; ERIC MCCUMBER; JONATHAN MELIKIDSE; CHRISTY MELIKIDSE; ROSE O'LEARY; STEVEN DAVID POTTER; TIMOTHY PUTNAM; LORRI ROBUSTO; WILLIAM ROBUSTO; KATHRYN SAY; AYDIN SAY; STARDUST HAWAI'I dba SEGWAY MAUI; MARTY STEVENSON; CONSTANCE STEVENSON; KAORU TANABE; ROLLAND WILLIAMS, JR.; and JENNIFER WISEMAN, Individually and in Their Representative Capacities and on Behalf of a Class and Subclasses of All Persons Similarly Situated, | CIVIL NO. 1CCV-23-0001045 JPC (Property Damage/Personal Injury)  **CERTIFICATE OF SERVICE** |
| Plaintiffs, | |
| vs. | |
| MAUI ELECTRIC COMPANY, LIMITED; HAWAIIAN ELECTRIC COMPANY, INC.; HAWAII ELECTRIC LIGHT COMPANY, INC.; HAWAIIAN ELECTRIC INDUSTRIES, INC.; COUNTY OF MAUI; HAWAIIAN TELCOM; HAWAIIAN TELECOMMUNICATIONS, INC.; HAWAIIAN TELCOM, INC.; SPECTRUM OCEANIC, LLC; CHARTER COMMUNICATIONS HOLDING COMPANY, LLC; CHARTER COMMUNICATIONS HOLDING, LLC; CHARTER COMMUNICATIONS, LLC; CHARTER COMMUNICATIONS OPERATING, LLC; TRUSTEES OF THE ESTATE OF BERNICE | |

PAUAHI BISHOP; PETER KLINT MARTIN;
PETER KLINT MARTIN REVOCABLE TRUST;
HOPE BUILDERS HOLDING LLC; HOPE
BUILDERS INC.; HOPE BUILDERS LLC;
KAUAULA LAND COMPANY LLC; KIPA
CENTENNIAL, LLC; DOUGLAS POSELEY;
DONNA ANNE POSELEY; JAMES C. RILEY
TRUST; JEANNE A. RILEY TRUST; WAINEE
LAND & HOMES, LLC; WEST MAUI LAND
COMPANY, INC.; MAKILA RANCHES INC.;
MAKILA LAND CO., LLC; MAKILA RANCHES
HOMEOWNERS ASSOCIATION, INC.; JV
ENTERPRISES, LLC; STATE OF HAWAI'I;
HAWAII HOUSING FINANCE AND
DEVELOPMENT CORPORATION; HAWAI'I
DEPARTMENT OF LAND AND NATURAL
RESOURCES; DOE POWER UTILITIES, 1–10;
DOE TELECOMMUNICATIONS, 1–10; DOE
PRIVATE LANDOWNERS, 1–10; and DOE
STATE LANDOWNERS, 1–10,

       Defendants.

---

## <u>CERTIFICATE OF SERVICE</u>

       The undersigned hereby certifies that a true and correct copy of the foregoing document was duly served on this date electronically through JEFS on the following parties as listed below:

JOACHIM P. COX
jcox@cfhawaii.com
RANDALL C. WHATTOFF
rwhattoff@cfhawaii.com
**COX FRICKE LLP**
**A LIMITED LIABILITY LAW PARTNERSHIP LLP**
800 Bethel Street, Suite 600
Honolulu, Hawai'i 96813

Attorneys for Defendants
**MAUI ELECTRIC COMPANY, LIMITED,**
**HAWAIIAN ELECTRIC COMPANY, INC.,**
**HAWAII ELECTRIC LIGHT COMPANY, INC., and**
**HAWAIIAN ELECTRIC INDUSTRIES, INC.**

DAVID J. MINKIN
djminkin@m4law.com
JORDAN K. INAFUKU
jinafuku@m4law.com
SARA M. HAYDEN
smh@m4law.com
KAMRIE J. KOI
kjk@m4law.com
**MCCORRISTON MILLER MUKAI MACKINNON LLP**
Five Waterfront Plaza, 4th Floor
500 Ala Moana Boulevard
Honolulu, Hawaiʻi 96813

Attorneys for Defendant
**COUNTY OF MAUI**

DATED:  Los Angeles, California, October 13, 2023.

*/s/ Graham B. LippSmith*
GRAHAM B. LIPPSMITH
MARYBETH LIPPSMITH
JACLYN L. ANDERSON
CELENE CHAN ANDREWS
ROBERT A. CURTIS
KEVIN D. GAMARNIK
LUIS A. SAENZ
ALEXANDER ROBERTSON, IV

Attorneys for Plaintiffs, Individually, and in Their
Representative Capacities and on Behalf of a Class and the
Subclasses of All Persons Similarly Situated